(No. 19063.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HIRAM REED, Plaintiff in Error.

*Opinion filed December 20, 1928—Rehearing denied Feb. 7, 1929.*

398

GEORGE W. SPRENGER, and RICHOLSON, ARMSTRONG & O'MEARA, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, RUSSELL O. HANSON, State's Attorney, and ROYCE A. KIDDER, for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

Hiram Reed was convicted in the circuit court of LaSalle county of a violation of the act "to punish persons for destroying property, or inflicting injury to persons, by means of any bomb, dynamite or other explosive, or by means of any similar instrument or implement," (Laws of 1921, p. 401,) and he prosecutes this writ of error to review the judgment.

The errors assigned and argued question the sufficiency of the evidence to prove the defendant guilty beyond a reasonable doubt, the admission of incompetent evidence, the giving and refusal of instructions, the rulings of the court in regard to the conduct of the State's attorney during the trial, and the conduct of spectators present at the trial.

The indictment charged the defendant with maliciously damaging, injuring and defacing a school house, and the evidence shows that on the morning of December 1, 1927, an explosion occurred in the school house which shattered the stove and the windows, defaced the seats, desks and other furniture, spread soot and dust throughout the building, drove bits of iron into the walls and ceiling, broke the plastering, and injured the teacher, Iola Bradford. She had arrived at the school house a few minutes earlier and had started to build a fire in the stove with paper from the waste-paper basket and corn-cobs. She lighted the paper and was standing in front of the stove, and about two feet from it, when the explosion occurred. She testified that she had closed the stove door and stepped back to wait for the cobs to burn, and that was the last she remembered until she opened her eyes and found herself on the floor of the school room and saw blood on her hands. She saw smoke or soot in the room and made an effort to get out. She finally succeeded in pulling herself up by the aid of the desk in front of the stove and went down the aisle and out on the porch. She leaned against the post and told the children who were in the school house yard, outside the school house, to go and tell her sister, at whose house, forty rods away, she was living. The children went, in obedience to her direction, toward her sister's home and she went through the school yard toward the gate, where she met a man who helped her walk until they were met by Howard Clegg, her sister's husband, who took her to the house, where she was put to bed and Dr. Peterson, of Rutland, came. He found that she had numerous cuts, lacerations around the face, chest, on the abdomen, legs and hand, some cuts large enough to require suturing. He took at least a dozen small pieces of metal from the wounds, the largest probably an inch long and a quarter of an inch wide. Clegg, in the garage at his house, heard the explosion, and two or three minutes later saw ten or fifteen children running and screaming, and after

talking with the first of them went with Theodore Paris, who was working for him, toward the school house. They saw Iola Bradford leave the school yard, leaning over, staggering and walking toward them and brought her home. He noticed the odor of exploded dynamite on her clothing. After calling Dr. Peterson he and Paris went to the school house and he noticed the smell of exploded dynamite there. Most of the windows were out, the stove was wrecked, pieces of the stove were sticking in the walls and doors and on the piano, the seats were scarred, the floor covered with spatterings of soot and plaster and glass. Many other witnesses visited the school house on the day of the explosion and the next day, who testified to the condition of the building and its contents and the character and extent of the injury done, and some of them testified to observing the smell of exploded dynamite in the building soon after the explosion. This testimony tended to show that there was a violent explosion of dynamite in the school house stove, that the school house was designed for human occupancy, was used and occupied by human beings and was damaged. Witnesses who testified that they observed the smell of dynamite also testified that they had used dynamite or that they were familiar with its odor and fumes and able to tell it when they smelled it. This testimony is criticised, for the reason that the witnesses were unable to tell what kind of an odor dynamite has because they did not know how to describe it. Most persons would probably find it difficult to describe the odor of a rose, whiskey, beer or limburger cheese, but this difficulty could scarcely be regarded as affecting the value of their testimony that they were familiar with and recognized the particular odor.

The defendant was about twenty-five years old and lived with his parents on his father's farm in Peoria county, about seven or eight miles from Chillicothe and about thirty-six miles from the school house, which is about four miles north of the village of Dana, in LaSalle county. On the

day of the explosion the sheriff of LaSalle county sent a deputy to bring him to the county jail. The deputy arrived at the defendant's house, near Mossville, in Peoria county, about 5:20 in the evening. He had no warrant for the defendant. The defendant ate his supper and left with the deputy in about a half hour in an automobile for Ottawa. The deputy, Orr, testified that on the way the defendant asked him several times what happened and if there was an explosion and anybody got burned. Orr told him that there was an explosion at the school house and the Bradford girl was in bad shape. He arrived at the county jail between 8:30 and 9:00 o'clock. Orr had had no supper and he fried some eggs in the jail and the defendant ate one. Orr asked him if he wanted another, and he said no; that he had all he wanted. The defendant remained in the jail office until about ten o'clock and was then taken into one. of the front rooms in the jail, which was called the "trusty" room.

Chester E. Jacobson, who was assistant State's attorney, saw the defendant about 9:00 o'clock while he was sitting in the jail office and afterward had a conversation with him in the trusty room about 10:30, in which the defendant told him he was engaged to marry Iola Bradford. Jacobson testified that he accused Reed of burning the school house; that Reed hesitated for a time, looked at Jacobson and said nothing, but finally said he did not do it. The State's attorney arrived later, and from that time until about four o'clock in the morning he questioned the de-. fendant in regard to the explosion at the school house, and about four o'clock a statement in writing was written by the State's attorney and signed by the defendant. This statement was introduced on the trial and is as follows:

"My name is Hiram Reed. I am twenty-four years old. I live near Chillicothe, Illinois. I have known Iola Bradford five years. I have been engaged to marry her for the last three months. On Wednesday, November 30, 1927, I called upon Iola Bradford at

the home of her brother-in-law, Howard Clegg, north of Dana, Illinois. I left my home around six o'clock P. M. in my Ford coupe. I arrived at the home of Iola Bradford about 9:00 P. M. I went in the house. Mrs. Clegg was up. The others were in bed. Iola got up and dressed and came out to talk with me. I stayed with her until about 12:30 A. M. Thursday, December 1, 1927. I told her I had sent her a ring from Peoria and asked if it had come yet. This was not true, as I had not sent her a ring. I had previously told her I would marry her on Sunday, December 4, 1927. When I came to see Iola Bradford on Wednesday, November 30, 1927, I had with me in my car a stick and a half of dynamite. I intended to place it in the stove of the school house where Iola Bradford teaches. This school is about half a block away from the place where she stays. When I left Iola on Thursday A. M., December 1, 1927, I went to the school house near her home and broke in the front door with a screw driver. I had the dynamite wrapped up in a paper. I had a fuse about ten inches long and dynamite cap attached to the dynamite. I tied the dynamite to the top of the stove on the inside with a piece of string. I intended that the dynamite should explode when the stove was started by Iola Bradford when she opened school Thursday morning. After placing the dynamite in the stove I went home, arriving there about 2:30 A. M. Thursday. I bought the dynamite at Dooley Bros. mining supply store in Peoria about two months ago. My folks did not know I purchased the dynamite. I kept it in the garage. I knew that Iola Bradford was in a family way and that I was responsible for her condition. She was in that condition for about three months. I planned on putting the dynamite in the stove a couple days ago. I went to the home of Iola Bradford on Wednesday last for the purpose of putting dynamite in the stove of her school room. I knew she was the one who started the fire in that stove each morning. I bought two sticks of dynamite at Doolans and took two sticks with me but threw half a stick of it in the Illinois river near Lacon, as I was going to the home of Iola Bradford on Wednesday, November 30, 1927.

"The only promise made to me by the State's attorney is that if Iola Bradford married me before the next grand jury meets this statement will not be used against me in any charge against her. If she does not marry me, then this statement may be used against me.                                                    HIRAM REED."

The next morning, December 2, the defendant was taken in an automobile to the school house, accompanied by the sheriff, the assistant State's attorney, Thomas S. Farrell, a deputy sheriff, and Charles Thiel, who was an investigator

in the State's attorney's office. There were a number of persons at the school house, and in their presence the plaintiff in error said that he put the dynamite in the stove, packing it in one of the small flues in the upper part of the stove, and that he got paper from the waste-paper basket up by the desk. He was taken outside and showed where he parked the car, and was then brought inside the school house again and questioned in the back part of the room. He said that he learned to use dynamite out of a book; that he got two sticks of dynamite in Peoria and he put a stick and a half in the stove and the other half stick he threw away in the river at Lacon. He said the reason he put the dynamite there was that he did not want to marry Iola Bradford if there was any other way out of it. A number of witnesses who were present testified to what occurred and was said at the school house. He was brought back to Ottawa and in the afternoon of the same day was examined in the State's attorney's office in the court house and the examination was taken down in shorthand by question and answer. The questions were propounded by the assistant State's attorney, and the transcript of stenographic notes of this examination was verified by the evidence of the stenographer who made them that the transcript was a true and correct statement of all questions asked of the defendant and the answers given by him at that time. The transcript was received in evidence over the objection of the defendant.

The defendant filed a petition before the impaneling of the jury to suppress the statement written by the State's attorney and signed by the defendant and enjoin the State's attorney from using any testimony or any evidence obtained by reason of any statements made or any action done at the school house following the signing of that statement and moved the court to grant a hearing on that petition. The court overruled the motion for a hearing at that time, but the statement and the testimony of witnesses to what occurred at the school house and the testimony as to the sub-

sequent examination of the witnesses in the State's attorney's office were later offered in evidence by the prosecution and were objected to by the defendant. At this time a hearing was had by the court, out of the presence of the jury, upon the competency of the evidence offered. This was in accordance with the proper practice in such cases. Whether a confession shall be received in evidence is a question to be decided by the court only when it arises on the trial. Until the confession is offered in evidence there is nothing for the court to consider. The ruling of the court denying a hearing on the motion to suppress the evidence and postponing consideration of its admissibility until the evidence was offered on the trial was proper. (*People* v. *Fox,* 319 Ill. 606.) The written confession was made while the plaintiff in error was under arrest at the jail, between four and five o'clock of the morning of December 2, after he had been subjected to questioning which began at eleven o'clock. He testified that he was constantly questioned by different people during the night from 11:00 o'clock to 5:00 or 5:30, was not given any rest, was not permitted to lie down, was not permitted to have any refreshments and they refused to let him have a drink. He said that for an hour and a half to two hours before the State's attorney came he was repeatedly questioned by Jacobson, the assistant State's attorney, and Thiel; that he was sitting at a table in the trusty room, his hands in front of him, with a pair of shackles on him for about an hour, when the shackles were taken off; that they called him a liar several times, Jacobson and Thiel taking turns at calling him a liar; that at the end of that time Hanson, the State's attorney, came in and introduced himself as a friend of the State's attorney, not telling him what his name was; that he took up the questioning from that time, the defendant believing he was a friend of the State's attorney; that he wanted the defendant to make a confession, but Reed told him he had nothing to confess; that Hanson questioned him until about

five o'clock, continuing to represent himself as a friend of
the State's attorney until Reed demanded to see the State's
attorney, saying he would not talk to anyone else; that Hanson then took a card out of his pocket and identified himself and wanted Reed to sign a statement, which he refused
to do until Hanson finally told him that he could show Reed
how it would be better for all parties concerned if he would
sign the statement; that the case would be hushed up and
there would be no publicity implicating Iola Bradford or
her folks or Reed's folks. Hanson did not start writing
the statement until about half an hour after that, during
which there was more questioning. Reed told him he could
put anything down he wanted to; that Reed would have
nothing to do with it. Reed asked Hanson what was to
be done with the confession after he took it. Hanson said
it was merely for his records—to be placed on file in his
office. Reed believed that. Reed got out of there between
5:00 and 5:30 in the morning and was taken to his cell.
The night before he got home between 2:00 and 2:30, got
up about five o'clock and the next day shucked corn all day,
and the officers arrived for him between five and six o'clock
in the evening. He did not have any sleep that day or the
night he was put in jail but was constantly questioned by
different people and not given any rest or permitted to lie
down or have any refreshments until 5:00 or 5:30 in the
morning. When he first went to the jail he was offered a
fried egg sandwich, of which he ate a part. He said that
he saw Hanson write exhibit 42, the confession. When he
got down to the dynamite there was a conversation about it.
Hanson wanted to know when and where he had bought
the dynamite. Reed told him he had not bought any. Hanson asked him how much dynamite he had used, and he said
he had not used any. Hanson asked him about how many
sticks of dynamite to put in the statement, and Reed told
him to suit himself, because he did not know what to put
in; that he did not care how many—to put in anything he

wanted to. Reed did not care what he put in because Hanson told him the statement was only to be used for his records and he had been promised immunity. The State's attorney then asked an officer or two in the room about how much dynamite it would take to blow up a stove. Their opinions varied from a half stick to a stick, and Hanson wrote in "a stick and a half." During this conversation Reed told him to put anything he wanted to in the statement because Reed didn't know what to put in. During the conversation Hanson made the remark that if Reed married Iola Bradford she could not testify, because then she would be his wife. He told Reed that was the law, and Reed believed what he told him about the law to be true. He said he was sitting on an ordinary kitchen chair with the back removed. Hanson asked him to sign the confession before the last paragraph was inserted, about the only promise made to him by the State's attorney. Reed told him he would not, and there was some conversation about it. Hanson had previously agreed to this "immunity promise, or whatever you call it," in the confession before Reed would assent to let him write that in. Hanson wanted him to sign it without that and Reed refused. Then Hanson said he would write it in, and he did so. He did not hand the statement to Reed and let Reed read it. Hanson read it to him. Reed said at the time of signing the confession he was suffering from lack of sleep, highly nervous and rather weak on account of want of food, and thirsty. He understood that if he would sign the statement, and in addition tell the story Hanson wanted him to tell, he would be given immunity on each and all charges and that he would be free to marry the girl and there would be no publicity to embarrass her or her folks or Reed's folks. Reed believed that. Hanson said that he could see no reason why she would not be as willing to marry Reed then as she had been. Reed thought she was willing to marry him at that time; that he had no reason to think otherwise; that he

was engaged to marry her. In regard to the statement made in the State's attorney's office the next afternoon, he said that he told Jacobson, who was questioning him, that he wanted that set subject to the same conditions as the set he was reading from; that Jacobson had the statement written by the State's attorney in his hand when he questioned Reed, and was reading from it when Reed made that statement to him.

The State's attorney, his assistant, the sheriff, his deputy, and all those who had any part in the arrest, detention and custody or questioning of the plaintiff in error, testified to what occurred at the time, denying all the statements of the defendant in regard to any ill-treatment, insults or indignities and showing that he was furnished food and had access to water, was not beaten, cursed, abused or ill-treated in any way. He was merely questioned, and while he may have found the all-night questioning tiring after his day's work and his loss of sleep the previous night, he did not make his statement until he received a written assurance which was satisfactory to him. He knew that if he married Miss Bradford she could not be a witness against him, and he expected to be able to marry her. The statement itself shows that the only promise made to him by the State's attorney was that if Miss Bradford married him before the next grand jury met, the statement would not be used against him in any charge against her, and if she did not marry him, then the statement might be used against him. What was meant by the words "any charge against her" is not apparent, but they do not affect the promise, which was that if Miss Bradford married him the statement could not be used against him, and if she did not it might be.

"Before any confession can be received in evidence in a criminal case it must be shown that it was voluntary. * * * 'A free and voluntary confession,' said Eyre, C. B., (*Warickshall's Case,* 1 Leach's Cr. Cas. 299,) 'is deserving of the highest credit, because it is presumed to flow from the

strongest sense of guilt, and therefore it is admitted as proof of the crime to which it refers; but a confession forced from the mind by the flattery of hope or by the torture of fear comes in so questionable a shape, when it is to be considered as the evidence of guilt, that no credit ought to be given to it, and therefore it is rejected.' The material inquiry, therefore, is whether the confession has been obtained by the influence of hope or fear applied by a third person to the prisoner's mind. The evidence to this point, being in its nature preliminary, is addressed to the judge, who admits the proof of the confession to the jury or rejects it, as he may or may not find it to have been drawn from the prisoner by the application of those motives. This matter resting wholly in the discretion of the judge upon all the circumstances of the case, it is difficult to lay down particular rules *a priori* for the government of that discretion. The rule of law applicable to all cases only demands that the confession shall have been made voluntarily, without the appliances of hope or fear by any other person. * * * Language addressed by others and sufficient to overcome the mind of one may have no effect upon that of another; a consideration which may serve to reconcile some contradictory decisions where the principal facts appear similar in the reports, but the lesser circumstances, though often very material in such preliminary inquiries, are omitted. But it cannot be denied that this rule has been sometimes extended quite too far and been applied to cases where there could be no reason to suppose that the inducement had any influence upon the mind of the prisoner." (1 Greenleaf on Evidence, sec. 219.) "The difference is between confessions made voluntarily and those 'forced from the mind by the flattery of hope or by the torture of fear.' If the party has made his own calculation of the advantages to be derived from confessing and thereupon has confessed the crime, there is no reason to say that it is not a voluntary confession. It seems that in order to

exclude a confession the motive of hope or fear must be directly applied by a third person, and must be sufficient, in the judgment of the court, so far to overcome the mind of the prisoner as to render the confession unworthy of credit." (Ibid. sec. 220a.)

"If there is sufficient in the facts and circumstances proved to show that the confession was freely and voluntarily made, there can be no abuse of the judicial discretion of the court in allowing the confession to be proved before the jury although there may be evidence of threats or promises at the time it was made. The record in this case shows that before admitting the evidence to go to the jury the court heard (out of its presence) the statement of the witness as to what took place between himself and the defendant just before the confession was made, and thereupon decided that the evidence was competent. In doing so we cannot say he abused his discretion in that ruling." (*Bartley* v. *People,* 156 Ill. 234.) The decision of the court on the preliminary question will not be disturbed unless it is manifestly against the weight of the evidence. *People* v. *Fox, supra; People* v. *Costello,* 320 Ill. 79; *People* v. *Guido,* 321 id. 397; *Hopt* v. *Utah,* 110 U. S. 572.

The last paragraph of the first statement made by the defendant is, that the only promise made by the State's attorney to the defendant was that if Iola Bradford married him before the next grand jury met the statement would not be used against him in any charge against her, and if she did not marry him then the statement might be used against him. In the evidence introduced on the hearing of the objection to the admission of the confession there is nothing showing any other promise made to the defendant. There is no suggestion in the evidence of any inducement to make the statement held out by the State's attorney, the sheriff or any other person. The suggestion of such condition came from the defendant himself. He says he refused to sign the statement until this provision was added to it,

and the condition was one over which the prosecution had no control, as the defendant knew. The performance of the condition and the time of its performance were dependent only upon himself and Miss Bradford. The defendant knew that if Miss Bradford married him she could not testify against him, and at his request the last paragraph was added to the statement. It constituted no inducement to him to make a confession of his guilt. He voluntarily made the statement, knowing that it could not be used against him if he married Miss Bradford but that it could be used against him if he did not. The court did not err in overruling the objections made to the confession signed by the defendant, to the one taken down in shorthand which was not signed, or to his acts and statements at the school house.

It is objected that the statement is shown to be not true, and it is not true in some particulars, as in the statement that the defendant bought the dynamite of Dooley Bros., in Peoria, but the confession having been made under conditions which rendered it competent to be received in evidence, the question of its truth was still a matter to be determined by the jury. The ruling of the court on the objection to the evidence was not based on the proposition that all the statements in the confession were true, but upon the fact that the confession was made under such circumstances as entitled it to be received in evidence and its truth to be determined by the jury upon their consideration of all the evidence in the case.

The plaintiff in error having argued the question of the competency of the confessions, proceeds to argue that, leaving this question out of consideration, he was not proved guilty beyond a reasonable doubt.

In addition to the testimony of Miss Bradford concerning the occurrence at the school house on the morning of December 1, the prosecution, in order to prove a motive for the commission of the crime, introduced her further testimony in regard to the relation between her and the defend-

ant. She was twenty-three years old and was a teacher. She began teaching the fall term of school in the school house in question on August 29, 1927. She and the defendant were second cousins, their mothers being first cousins, and were engaged to be married. They engaged in sexual intercourse, with the result that she became pregnant. She discovered her condition the latter part of August and about August 28 told him of it. For some weeks they discussed the question of marriage, and some efforts were made to procure an abortion, he consulting doctors and procuring drugs for her to take, and she visiting one of the doctors four or five or six times. Nothing came of these attempts, and it was finally agreed that they would be married in Davenport, Iowa, on November 20, but on that day he telephoned her he had a bad cold and would not be over. They looked at wedding rings and he promised to get the license. Apparently she desired the marriage to take place and he was delaying it or at least was not pressing it, but on Sunday, November 27, he told her that he had been to Springfield and arranged for a license and a Methodist minister to perform the ceremony; that her ring was not ready but he would get it Monday or Tuesday and they would be married on December 4, which was the next Sunday. Since she had been teaching this school it had been his custom to drive over from his home Friday afternoon and take her after school to her father's home, in Chillicothe, for the week end. This week, however, he called at Clegg's house unexpectedly about nine o'clock in the evening, after everybody but Mrs. Clegg had gone to bed. She called her sister, Iola, who dressed and came into the dining room, where they were. He helped Iola with some arithmetic problems which she had and he had a trick or catch-problem which he showed them. When this was finished Mrs. Clegg withdrew, and Iola asked him why he had come over that night. He said to see how the ring fitted, and she told him she did not get the ring. He said he mailed her the ring Tues-

day afternoon. She asked him if he had got the license, and he said he had. She asked him where it was, and he said at home, inside the bed-springs, covered up; that he thought that would be a safe place for it until the next Sunday. She said she would like to have seen it. Before he went home they had a lunch of bread and some coffee which she made after starting the fire, which had about gone out in the kitchen stove, with cobs. He stayed until about one o'clock. She went to the parlor window and looked out as he started the car down the road and turned east towards the school house. All this testimony of Miss Bradford was objected to because irrelevant to the issue and not tending to prove the charge made in the indictment, but it was competent for the purpose of showing a motive for the defendant to commit the crime and the objection was properly overruled.

The evidence shows beyond a reasonable doubt the explosion at the school house, the injury to the property and a motive for the commission of the crime by the defendant, but it is contended that it does not show beyond a reasonable doubt the guilt of the defendant, or that the explosion was caused by dynamite or any similar explosive. The stove was known as a Hero furnace, was about five feet and seven inches high and constructed of cast-iron except six or seven tubes, which were of charcoal iron, three and a half or four inches in diameter and six and a half or seven inches long, reaching from the top of the fire-box to a radiator at the top of the stove. At the bottom of the stove was a cast-iron ash-pit, about 22 or 23 inches in diameter, supported on legs about six inches above the floor. The fire-pot of cast-iron, about half an inch thick, corrugated inside and out, circular, about 22 inches in diameter at the top and 20 inches at the bottom and 20 to 24 inches high, rested on the ash-pit. Above the fire-box, and resting upon it, was the body of the furnace, a circular casting a half-inch thick, 22 inches in diameter, extending straight up and down, the

lower part fitting upon the top of the fire-pot. The whole stove was surrounded by a circular sheet-iron casing or jacket 35 inches in diameter, in which, opposite the body and above the fire-pot, was the cast-iron front door. Above the circular body of the furnace were the six charcoal iron tubes which have been mentioned, fitted over six openings in the top of the body. These tubes, when placed in position, were attached above to a cast-iron radiator, cone-shaped at the bottom and rounded at the top. The stove pipe was connected with the radiator. It extended vertically from the top of the radiator several feet, then horizontally about fifteen feet, when it again turned and entered the chimney. After the explosion the fire-pot was cracked, the grates were broken, the body of the furnace was shattered and blown into small pieces, many of them being blown into the walls, the ceiling, the desks, the piano and the floor, the radiator was broken, the tubes were twisted and burst open, and one of them was blown through a window and eighty feet away in the school house yard. The stove was put in good repair in August, before the term of school began. The damper in the pipe just above the furnace was loose, and a week or two before the explosion one of the directors, at Miss Bradford's request, wired it shut, and after that it was closed all the time. Before she left the school house, about 4:30 o'clock in the afternoon of November 30, Miss Bradford put a lump of coal 10 or 11 inches in diameter in the stove, where there were some embers. When she returned the next morning she poked the coal with the stove poker, breaking it up, but there was no sign of fire, and she proceeded with her preparations for starting a fire.

William E. Tydeman, a teacher of chemistry in the Ottawa township high school, who had had fifteen years' experience in chemistry, was asked a hypothetical question, assuming the facts shown in regard to the explosion and its effects, whether he had an opinion as to the probable cause of the explosion. He answered that he had, and be-

ing asked what that opinion was, answered: "It is possible, under the conditions outlined in the question, that, with the damper and door of the stove closed, soft coal gas had collected and formed during the night in the upper part of the stove, and also when the lump of coal placed in the stove the night before was poked into small pieces in the morning and when the paper was placed on top of the small pieces of broken coal and lit at the front and back, an explosion was caused." The question contained the assumption that a heavy sediment of coal soot was scattered over the floor, desks and other top spaces to such an extent that from a quart to three bushels was taken from the room, and the witness stated, on cross-examination, that his opinion was based on the assumption that three baskets of soot had been found in the room; that he did not think it possible for that amount of soot to collect in the stove from September 27 to December 1; that in his opinion the gas would stay in the top of the stove and could not escape because the damper had been shut; that he assumed there was about three bushels of soot in the stove. This assumption is based upon the statement of Wayne P. Cooper, one of the school directors who helped to clean the school room after the explosion, that they carried out the rubbish in basketfuls—half a dozen of rubbish and everything; that he supposed the soot would run into two or three bushels. Dwyer and Bane were the other two directors. They were both with Cooper, helping to clean the room, and testified that everything was swept up in piles and carried out in baskets; there was a little of everything on the floor,—ashes, cobs, plaster board, glass,—two baskets of refuse and part of a third carried out; that there was not very much soot, but there was soot and dust together puffed out over the floor and desks. In reliance upon the opinion of Tydeman as to the possibility of an explosion of gas and rejecting the testimony of the People's witnesses as to the smell of dynamite and the noise and shock caused by the explosion as incredible, counsel for

the defendant arrive at the conclusion that there was no credible evidence proving the defendant guilty beyond a reasonable doubt. We do not accept this view, and in our opinion the jury, as indicated by their verdict, gave proper consideration to the weight of the evidence and arrived at a correct conclusion.

After the impaneling of the jury and before the statements of counsel the defendant moved that the court exclude all the witnesses, including Iola Bradford, and the court allowed the motion except as to Miss Bradford, who was permitted to remain in the court room at counsel's table during the trial. It is contended that this was error. The exclusion of witnesses is, however, discretionary with the court. If the judge deems it essential to the discovery of truth that the witnesses be examined out of the hearing of each other he will so order it, and the order, upon motion or suggestion of either party, is seldom withheld, but the party is not entitled to it as a matter of right. (I Greenleaf on Evidence, sec. 432.) The order was not refused in this case but Miss Bradford was excepted from its operation. There was no abuse of discretion in this exception. It is apparent that her testimony could not have been affected by the testimony of the witnesses who preceded her, and in view of all the evidence in the case it is also manifest that the defendant was not injuriously affected by her presence during the examination of the other witnesses. The evidence of her condition and the defendant's responsibility for it and of his efforts to assist her in procuring an abortion was competent to show his motive for the commission of the crime and the extent to which he was influenced by it. While the People are not required to prove a motive for a deliberate criminal act, the presence of a motive for the defendant to commit the act charged is important in considering the question whether he did it, and it is always proper for the People to prove motive where it can be done, even though such proof may disclose the

commission of another crime. *People* v. *Looney,* 324 Ill. 375; *People* v. *Watkins,* 309 id. 318.

After several of the school children who were present in the school yard outside the school house had testified another was called, and the defendant objected to the calling of any more of the school children on the ground that their testimony could be no more than cumulative, and to produce it to the jury would be a menace to the defendant's rights and work to the prejudice of his rights in the minds of the jury. Their testimony was competent and the objection properly overruled. So, also, the testimony of the doctor as to Miss Bradford's injuries, and the torn and bloody coat and dress she wore, though cumulative, were competent to show the force of the explosion.

Objection is made to several instructions given at the request of the People. No. 7 stated that if the jury believed the defendant, from the evidence, beyond a reasonable doubt, guilty of the crime charged in the indictment, then they should find him guilty, even though they further believed that prior to the commission of the crime he was a man of good reputation. It stated the law. Nos. 10, 11, 12, 13, 14 and 17 are objected to because they are misleading, single out certain facts from the State's evidence, ignore the defense and direct a verdict without any consideration of any defense evidence. The defense was merely a denial. The criticism points out no specific objection to any part of these instructions and we have found none. Thirty-nine instructions were given at the request of the defendant. The refusal of Nos. 40, 41, 42 and 47 is complained of. The substance of Nos. 40, 42 and 47 was given in other instructions, and No. 41 was inapplicable to the case. It stated that in a prosecution depending upon circumstantial evidence, alone, which is not conclusive in its character, previous good character of the accused is entitled to great weight in favor of innocence. This was not a case depending upon circumstantial evidence alone.

Complaint is made of the conduct of the State's attorney in his opening statement and in his argument on the submission of the cause to the jury. In his opening statement the State's attorney referred to the children at the school house as "little innocent children who might have been your children or my children." An objection was sustained. He referred to the "attempt to kill or maim or disfigure any little innocent children," and an objection was overruled. He continued, "It is not a motive that will actuate a brave man, a decent man," and the court sustained an objection, saying, "A statement should be limited to the facts the side expects to establish in the trial and all arguments and inferences should be eliminated." The attorney continued, "the motive that you will find embedded in the craven heart of this defendant," and an objection was overruled. He then stated: "The defendant sitting there is the sole child of a father and mother who operated a farm of some two hundred acres near Chillicothe; a pampered son, a spoiled son, a bully who had always had his way, had what he wanted, never had discipline of any sort." This was objected to and the objection was sustained.

The object of an opening statement is to advise the jury concerning the questions of fact involved so as to prepare their minds for the evidence to be heard, and it should not be permitted to become an argument. (*People* v. *Arnold,* 248 Ill. 169.) Vituperation, offensive epithets and argument have no place in such a statement. The State's attorney violated this rule, but the court promptly sustained objections to most of his improper statements, and though the State's attorney with some pertinacity sought to evade the restrictions of the court and was deserving of rebuke, we do not regard his misconduct such as to require the reversal of the judgment.

Objection is also made to portions of the closing argument of the State's attorney. A prosecuting attorney has the right to denounce the defendant as guilty of the crime

charged if the evidence fairly tends to prove his guilt, to draw inferences unfavorable to the defendant if based on the evidence, and under such circumstances to reflect unfavorably on the defendant and denounce his wickedness. Mere intemperate invective and abuse ought not to be indulged in or permitted. It is not easy to state a rule applicable to all cases, but so long as the attorney is actually discussing the evidence allowed to be received and its applicability to the case and fairly attempting to present the conclusions which he claims should be drawn from the evidence, he is within the scope of proper and fair argument. The conduct of the State's attorney was not of such character as to demand or justify a reversal of the judgment.

There was some disorder at the trial. Counsel for the plaintiff in error refer in their brief to four instances. The first was during the examination of one of the pupils of the school, who was asked what he noticed at his home that morning before he started to school. An objection to the question was overruled, and the court followed his ruling with the observation, "There must be no noise in the court room. Proceed." The bill of exceptions shows no more than this. It says nothing as to the character of the noise which brought forth this remark, and there is certainly no evidence of any demonstration of hostility to the defendant. Later the court overruled an objection by the defendant to a question whether any part of a curtain was adhering to an exhibit, No. 20. The court overruled the objection and remarked: "We must have no demonstrations on the part of the audience in this proceeding. Anyone that does that will be ordered to leave the court room. There must be no talking—no noise of any kind. If anybody wants to leave during the session you must go out quietly. You will have to maintain order throughout the session. If you want to stay here you must abide by these directions." Here, again, the bill of exceptions gives no indication of the character of the demonstration. There is nothing to indicate

unfriendliness to the defendant. It may have been only a demonstration of curiosity to see the exhibit or of the weariness of the audience and the noise made in moving about or leaving the room. A third instance occurred during the cross-examination of Tydeman, the teacher of chemistry, who, having stated that he assumed there were about three bushels of soot in the stove, was asked, "Isn't it a fact that three bushels of soot would occupy nearly all the room in the stove?" The court said to the audience, "There must be no laughter in the court room." It may be inferred that scmebody in the court room had laughed or spoken. The other instance of disorder occurred in the cross-examination of the defendant and is narrated in the bill of exceptions as follows:

Q. "Well, why did you answer Cooper's questions, then, if you were carrying out the instructions of the State's attorney's office? (Spectator in the audience claps his hands.)

The court: "Who is responsible for that demonstration? (Man in audience arises and says, "I forgot myself; I beg your pardon.")

The court: "Mr. Bailiff, take that man out of the court room. (To the audience): I warn you against any further demonstrations of this character. There must be quiet in the court room if you wish to stay in here, and any further demonstrations will be punished by ejectment from the court room."

The constitution requires a public trial. The judge presiding at the trial has ample power to enforce order and compel decorum in the court room and it is his duty to exercise this power in an effective manner. There were more than fifty witnesses in attendance, the character of the charge and the circumstances attending the case were unusual, and it is not surprising that a considerable number of persons attended the trial. The bill of exceptions shows no flagrant act of disorder except in the case of the person who clapped his hands. When the court inquired who was

responsible for this act the man immediately arose and apologized and the court ordered him out of the room. Perhaps a small fine would have been a more potent reminder of the respect required of those in attendance on the session of a court. The record does not show any failure of the court to take such action to preserve order as was necessary or any occurrence which was prejudicial to the rights of the defendant.

After the conviction and sentence of the plaintiff in error he was allowed ninety days from March 17 in which to file a bill of exceptions. On May 14 he filed a second motion for a new trial, showing that he had learned on May 11 that several books of the original notes of the official reporter containing the testimony of the defendant and his witnesses had been stolen. The defendant did not remember the testimony of the witnesses or the various rulings of the court contained in those books and had no way of supplying them and by reason of the loss of them could not present a complete bill of exceptions to the Supreme Court, and was therefore deprived of his constitutional rights in being denied a hearing in a court of last resort upon the evidence and the constitutional and legal questions involved if the court did not grant him a new trial. The court granted leave to file the motion, but subsequently, on motion of the State's attorney, struck it from the files. The defendant excepted to this order and filed an additional bill of exceptions. He contends that a new trial should be granted on account of the loss of these stenographic notes, and that the bill of exceptions which the court signed fails to show many things which occurred on the trial. The bill of exceptions must be authenticated by the trial judge or by another judge authorized in the manner provided by the statute, and his certificate is conclusive as to what occurred on the trial. It is the duty of the court, if a party to the cause shall reduce his exception to writing, to allow the exception and sign it. The truth of it is to be deter-

mined by the court, and its determination is final and can not be questioned in a court of review. It was not error to strike the additional motion for a new trial.

A motion to quash the indictment and a motion in arrest of judgment were made and an exception was taken to an instruction given, all based upon the same ground that a school house is not necessarily a building used or designed for human occupancy within the meaning of the act. Various counts charge that the building was designed for human occupancy, others that it was used and occupied by human beings, and several that it was used and occupied by human beings, to-wit, school children and a school teacher. It was not a dwelling or residence, but the language of the act is, "building used or designed for human occupancy," and it is not an arguable question that the building was designed for human occupancy and was actually used for that purpose on days when school was taught.

The judgment is affirmed. *Judgment affirmed.*