THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HENRY DIXON, Defendant-Appellant.

First District (2nd Division) No. 58632

Opinion filed February 17, 1976.

James J. Doherty, Public Defender, of Chicago (William D. Trude, Thomas F. Finegan, and John T. Moran, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, John T. Theis, and Michael T. Reid, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HAYES delivered the opinion of the court:

In July of 1972 defendant Henry Dixon and three others not presently before this court (namely, Sylvester Gibson, Michael Daniel, and Maurice Woods) were tried jointly in a bench trial for the offenses of attempt murder and two counts of aggravated battery. (Ill. Rev. Stat. 1969, ch. 38, pars. 8—4, 12—4 and 12—4(b)(1).) All these offenses were alleged to have been committed against one Carl Jordan. Dixon was found guilty in the manner and form as charged in the indictment and was sentenced to a term of from 8 to 15 years in the penitentiary.

The offenses for which defendant Dixon was convicted allegedly occurred on 20 December 1971, about 7:45 p.m. at the apartment of Carl Jordan, then age 15, at 2145 W. Lake Street in Chicago. According to the State, Dixon and eight other youths (of whom three were Dixon's co-

defendants at trial) came to Jordan's front door and engaged him in conversation. Thereafter, one of the youths (namely, co-defendant Woods) fired a sawed-off shotgun and struck Jordan in the abdomen.

Since one of the issues raised by Dixon on appeal is whether the evidence adduced at trial proved him guilty beyond a reasonable doubt, the evidence will now be summarized.

Irma Gray, Carl Jordan's mother, testified that at 7:30 or 7:45 p.m. on the date in question she was in the living room of her home, the Lake Street apartment mentioned above. Her younger son answered a knock on the front door, whereupon she saw her elder son Carl conversing at the door with one Odell Rankin and one Willie Dunn. Other than Rankin and Dunn, Ms. Gray was able to see only about five or six shadows outside a window. This window was in the living room about 5 to 6 feet to the right of the door from Ms. Gray's point of view. After about 10 minutes of conversation, Carl ducked his head back and leaped toward the floor. Ms. Gray then heard a gunshot blast and saw a long blast of fire coming through the open front door. Another shotgun blast then came through the living room window. Looking through the window, she saw approximately nine young black males running through a playground to the east of the apartment at a distance of about 50 feet. Her son Carl was lying wounded on the floor of the living room.

Chicago Housing Authority Patrolman James White testified that, on 20 December 1971, he was on duty at about 7:45 or 8 p.m. in the 2100 block of West Lake Street. While sitting in a car in a parking lot, he heard a shotgun blast. Five or 10 minutes later, he and his partner observed four youths running through a breezeway at 2029 W. Lake. The witness and his partner got out of their car and stopped the first three youths, one of whom was defendant Dixon. A fourth youth (one Guy Rufus), trailing the other three by 15 to 20 feet, was also stopped. Upon a search, Rufus was found to be carrying a sawed-off shotgun. Although Rufus denied having fired the gun, his hand was bleeding between the thumb and forefinger. The witness stated that Rufus' shotgun had been fired once, because there was an expended shell in the shotgun together with one live shell. The witness and his partner then transported the four youths and the gun and shells to their Chicago Housing Authority office at 1834 West Washington Street and turned the youths and the gun and shells over to Chicago police officers.

Officer William Frapolly of the Chicago Police Department testified that, on 20 December 1971, he was on patrol. He was called to Chicago Housing Authority headquarters at 1836 W. Washington Street at about 8 p.m.[1] There, two CHA guards gave him a sawed-off .12-gauge shot-

---

[1] West Washington Street is two blocks south of West Lake Street.

gun along with an expended .12-gauge cartridge and a .12-gauge shell. He then had occasion to interview the victim and the victim's mother and sister at the Lake Street apartment in connection with his further investigation. Carl Jordan, then still lying wounded on the floor of the living room, gave him two nicknames, in response to his question to Carl as to who had shot him. He didn't recall any names being given by Ms. Gray.

Officer Frapolly was later recalled as a witness for all the defendants. Frapolly then stated that he thought Carl Jordan identified his attackers as "Baby Gangster" and "Moose," but that Jordan's voice was slurred. He didn't think that Jordan gave him any other nicknames or names. If Jordan gave other names, he didn't understand them. He didn't think Jordan gave him nine nicknames.

Carl Jordan, the victim, testified that he was 15 at the time of the shooting. At 7:45 p.m. on 20 December 1971, his younger brother answered a knock on the front door of their apartment at 2145 West Lake Street in Chicago and opened the front door. Willie Dunn was there. The area was illuminated by a 300-watt bulb on the outside of the building above the door and about 11 feet up from the ground. He could see very clearly. Odell Rankin was at the left side of the door from Carl's point of view. He spoke with Rankin and Dunn through a screen door for about 10 minutes. He also saw five shadows and a person referred to as "Little Moose." Then, Mike Daniel, Henry Dixon, and Sylvester Gibson jumped out, each holding a sawed-off shotgun, at a range of 4 to 5 feet. Dixon told him to come out. Others present included Andrew Williams, Guy Rufus, and one "Little Moose." All told, six of those present had shotguns and one had a handgun. Woods fired through the screen door, hitting Jordan at a distance of one foot. After Jordan was shot, there was a second shot through the window.

On cross-examination, Jordan stated that Dixon was pointing a shotgun at him. His nine assailants were standing from left to right in the following order—Woods, Williams, Rufus, Dunn, Rankin, Daniel, Gibson, Dixon, and Little Moose. Jordan denied telling his mother or any police officer that he was shot by "Baby Gangster" (Dunn). He testified that, while he was lying wounded on the floor of the living room, he gave the investigating police officer (Frapolly) the nicknames of eight of the assailants. It was also established that, at the preliminary hearing, Jordan did not testify that Dixon either spoke to him or was holding a gun at the time of the shooting. Also, Jordan testified at grand jury proceedings that he had mentioned only Dunn and Rufus to the police. At trial, he stated that his mind was cloudy at the preliminary hearing

because of the medication he was then taking. (The preliminary hearing was held 5 days after the shooting.)

Jordan stated that he did not know whether the bulb illuminating the area was 300 watts but that he assumed that it was from his experience with light bulbs. At any rate, the area was bright and he could see clearly.

The State then offered the shotgun and shell recovered from Rufus as evidence. Defense counsel objected on the basis that the gun had not been sufficiently connected to the incident or to any of the co-defendants. These items were admitted into evidence, whereupon the State rested its case-in-chief.

For the defense, the first witness was Youth Officer John McAvoy. He participated in the investigation of Jordan's shooting. At 9 p.m. on 20 December 1971, he spoke with Ms. Gray at the 13th District Police Station. There, she stated that Andrew Williams was the person who shot her son.

Portia Atkinson testified that she was 17 and lived at 2051 W. Lake Street, one-half block east from Jordan's apartment. On 20 December 1971, Dixon and two of his three co-defendants (namely, Gibson and Daniel) were at her home at 6:30 p.m. They remained there until 8:05 p.m. Also present were her mother and younger brothers and sisters. They were dancing, listening to music, and talking during the time in question. Atkinson also testified as to the light fixture in the vicinity of the Jordan apartment and stated that its bulb was a 75-watt bulb. On cross-examination, the witness was confused about the date and stated that Dixon and his co-defendants were in her apartment on 22 December rather than on 20 December. On redirect, she stated that the day in question was the Monday before Christmas. In 1971, the Monday before Christmas was 20 December.

No further witnesses were called on behalf of Dixon.

Another matter, reflected in the record but not appearing in the report of proceedings, concerns the alleged bias of the trial court. Just prior to the start of the trial, the trial judge noticed what appeared to him to be a spectator making threatening gestures to a State witness. The trial judge, indicating that he was not prejudiced, very strongly admonished all present in the courtroom that no threats would be tolerated and that, if any witness were harmed, serious measures would be taken. No objections to his remarks were made at this time, nor was there a motion for a change of venue or substitution of judges. Thereafter, all co-defendants waived a trial by jury. Further details of this occurrence are set forth later in this opinion. On appeal, defendant

argues that the judge's comments reflect his bias and denied defendant a fair trial.

It should also be noted that, while the court found defendant guilty in the manner and form charged in the indictment, the court also stated, "No, there was a finding of guilty in manner and form. There is attempt murder[,] and aggravated battery is merged in the attempt." Hence, it appears that the finding of guilty in manner and form was really intended to be a finding of guilty of attempt murder only, and only one sentence was imposed.

In addition to the issue of whether the evidence was legally sufficient to prove defendant Dixon guilty beyond a reasonable doubt, other issues raised on this appeal are whether the on-the-scene identification was made under inadequate conditions; whether the shotgun and shell taken from Rufus were improperly admitted into evidence; and whether defendant's sentence was excessive.

OPINION

Initially, defendant contends that the court's pre-trial admonitions demonstrated such bias as to deny the defendants (including Dixon) the right to a fair trial inherent in due process. A more detailed account of these happenings is now necessary in order to analyze this contention. Just prior to the beginning of the trial, the trial judge announced that he observed a male individual gesturing to another person who was to be a State witness in defendant's trial. He announced to each of the co-defendants and their lawyers that, if he found out that anyone of their supporters was attempting to put any witness in the case under duress or threat, such person was going to have trouble with him. Specifically, he admonished the defendants to "call your dogs off" because, if they attempted to intimidate witnesses, they would deal with him and he would not be easy.

Immediately thereafter, defendant Dixon waived a jury trial and signed a jury waiver form. After the first day of testimony at the trial, in a conference with counsel, the trial judge specifically stated that he was not prejudiced and that he would judge the case fairly and impartially. At no time during the proceedings did Dixon or any of the other three co-defendants move for a substitution of judge or for a change of venue.

■■ On this separate appeal by Dixon, he relies primarily on *People v. Vine* (1972), 7 Ill. App. 3d 515, 288 N.E.2d 69. This case holds that due process is violated where the court acts on matters outside the trial record. *Vine* has no applicability here. The court could observe the spectator's threatening behavior. From this behavior and attendant circum-

stances, the court could infer the possibility that a State witness was being threatened. The court did not specifically accuse the defendants of being responsible for the threat. Rather, it warned defendants and all others present that threats of any sort would not be tolerated. A trial judge has wide discretion in maintaining order in the courtroom and it is his duty to do so. (*People v. Reed* (1928), 333 Ill. 397, 164 N.E. 847.) Spectators at any trial should not be permitted to manifest their prejudice or partisanship. If this occurs, the court must take the necessary steps to preserve order and decorum. (*People v. McMahon* (1910), 244 Ill. 45, 67, 91 N.E. 104.) We do not believe that the trial court abused its discretion here. The trial court specifically stated that it was not prejudiced. No prejudice or bias against the defendants appears in the record of the trial itself. Apparently, defense counsel and defendants themselves were not then concerned with the matter of the trial court's bias or prejudice since thereafter no motion for a change of venue was made and all defendants waived a jury, electing to be tried by the same trial judge. Under these circumstances, even a hypothetical error in the trial court's admonition to the spectators was waived. *People v. Lawrence* (1963), 29 Ill. 2d 426, 194 N.E.2d 337, *cert. denied*, 376 U.S. 946, 11 L. Ed. 2d 770, 84 S. Ct. 804.

■■ Next, defendant contends that the .12-gauge shotgun and shell should not have been introduced into evidence because they were not connected to the defendant. The State contends that it need connect the weapon only to the crime with which the defendant is charged. Defendant, however, is correct in his assertion that a weapon may not be admitted into evidence unless it is connected to both the defendant and the crime. *People v. Germany* (1963), 28 Ill. 2d 154, 190 N.E.2d 713; *People v. Jones* (1961), 22 Ill. 2d 592, 177 N.E.2d 112; *People v. Kimbrough* (1970), 131 Ill. App. 2d 36, 266 N.E.2d 431.

*People v. Miller* (1968), 40 Ill. 2d 154, 238 N.E.2d 407, *cert. denied*, 393 U.S. 961, 21 L. Ed. 2d 375, 89 S. Ct. 401, on which Dixon also relies, is clearly distinguishable on its facts from the instant case. Rather, the appropriate test is found in *People v. Jones.* The basic issue is one of evidentiary relevance. To connect physical evidence to the accused for evidentiary purposes, possession is one but not the only factor to be considered. The factor of connection is met if the physical evidence is sufficiently connected with the crime and with the defendant so as to make the physical evidence relevant as evidence against the defendant. Here, defendant Dixon was tried on an accountability theory. Two shots apparently were fired—one by Woods into Jordan's abdomen and one through the window by another member of the group. Rufus was identified by Jordan as having been on the scene at the time of the shooting.

One shot had been expended from the shotgun which Rufus was carrying when he was apprehended. Rufus' hand was bleeding—possibly from the recoil of a recent shotgun discharge. From this, it could be concluded that Rufus and his weapon were connected to the crime. Jordan identified Dixon as having been in the presence of Rufus on the scene of the shooting. Rufus was apprehended while running behind Dixon, Daniel, and Gibson. This connects Dixon to Rufus and thereby to Rufus' shotgun for purposes of evidentiary relevancy. The trial court as trier of fact could place whatever weight it chose on the evidence. Hence, the shotgun and shell were propery admitted into evidence.

■■ Next, defendant contends that he was not found guilty beyond a reasonable doubt. Specifically, he argues that the complaining witness' pretrial testimony varied substantially from his trial testimony so as to impeach the credibility of his trial testimony. In addition, defendant urges that the complainant's on-the-scene identification of defendant was legally insufficient since it was made under inadequate lighting conditions.

On review of the record, it is apparent that Jordan's trial testimony was not entirely consistent with his pretrial statements. However, it was for the trial court as trier of fact to resolve these inconsistencies and to determine the extent to which complainant's trial testimony was credible. (*People v. Hubbard* (1972), 4 Ill. App. 3d 729, 281 N.E.2d 767, *cert. denied,* 416 U.S. 958, 40 L. Ed. 2d 308, 94 S. Ct. 1973.) As in *Hubbard,* the complaining witness' testimony here was corroborated by the witnesses, facts and circumstances adduced at trial. *People v. Smith* (1968), 41 Ill. 2d 158, 242 N.E.2d 198, *cert. denied,* 396 U.S. 852, 24 L. Ed. 2d 101, 90 S. Ct. 111.

■■ As to the contention that Jordan's identifications were insufficient because of the inadequate lighting conditions, Jordan testified that the area was lit by a 300-watt bulb. Portia Atkinson testified that it was lit by a 75-watt bulb. But Jordan was observing people whom he knew and from a distance of only a few feet. The precise wattage of the bulb is therefore immaterial. Jordan testified that the area was sufficiently lit for him to see. He knew the people he saw. Under the circumstances, Jordan's identification testimony is sufficient to support the judgment. *People v. Canale* (1972), 52 Ill. 2d 107, 285 N.E.2d 133.

In summary, upon our review of the evidence, we find that the trial court could properly have found defendant Dixon guilty of the crimes charged beyond a reasonable doubt.

■■ Next, the defendant argues and the State concedes that defendant can be found guilty of, and sentenced for, attempt murder only because the aggravated batteries occurred in the course of the same transaction;

he can be neither sentenced for, nor convicted of, either of the charges of aggravated battery. While he was sentenced only on his conviction of attempt murder, he contends that he was convicted of both charges of aggravated battery.

We agree with defendant that he cannot be convicted of either charge of aggravated battery, but we do not think that the record shows that he was so convicted. The finding was "guilty in the manner and form of the indictment." However, the record reflects that the trial judge knew that aggravated battery arising from the same transaction as the attempt murder merges with attempt murder, the more serious offense. (See the later case of *People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1.) We construe this record to be a judgment of guilty for the offense of attempt murder only.

As to the contention that the sentence was excessive, we find that the sentence of 8 to 15 years was not excessive under the circumstances of this case. The court must take into account the seriousness of the offense as well as the defendant's potential for rehabilitation in reaching its sentence. (Ill. Const. 1970, art. I, § 11.) The complainant here was shot by a sawed-off shotgun at point-blank range while standing in his living room. A sentence of 8 to 15 years for such a heinous offense is well within the trial court's discretion and we will not disturb it here.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

LEIGHTON and DOWNING, JJ., concur.