THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES GOODMAN, Defendant-Appellant.

First District (2nd Division)   No. 81—830

Opinion filed September 14, 1982.

Alan D. Blumenthal, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, David A. Shapiro, and David A. Baitman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PERLIN delivered the opinion of the court:

Following a jury trial defendant, James Goodman, was convicted of attempt armed robbery and armed violence. (Ill. Rev. Stat. 1977, ch. 38, pars. 8—4, 33A-2.) The trial court entered judgment only on the armed violence conviction and sentenced defendant to serve eight years in the Illinois Department of Corrections. Defendant appeals contending that (1) the judgment of conviction for armed violence was improper because it constituted a double enhancement of the predicate felony of attempt armed robbery; (2) admission of evidence of a gun and of another crime deprived defendant of a fair trial; (3) a pretrial photographic identification procedure was unduly suggestive and therefore identification testimony given by witnesses Laura Potter and Debbie DeMaso should have been suppressed; (4) the trial court placed an improper limitation on defense counsel's cross-examination of witness Debbie DeMaso; (5) prosecutorial misconduct deprived defendant of a fair trial; (6) defendant was not proved guilty beyond a reasonable doubt.

For the reasons which follow we reverse defendant's conviction and remand the cause for a new trial.

On October 5, 1979, at approximately 9 p.m. two men entered the Brown's Chicken restaurant located on South Harlem Avenue in Bridgeview, Illinois. One of the men shouted, "Don't push any buttons or call the police." As Laura Potter (Potter), an employee of Brown's Chicken, turned to face the men, one of them placed a brown paper bag on the counter in front of Potter and ordered her to take the money from the cash registers and put it into the bag. Potter "crumpled the bag up" and threw it into the garbage. The offender subsequently identified by Potter as defendant thereupon produced a "dark revolver with white grips," aimed the gun at Potter's stomach and said "we are not kidding." Potter screamed, "My God, someone help me. He wants money." The unarmed offender began pounding on a cash register in an apparent attempt to open it. Since the restaurant was scheduled to close shortly, the cash register was locked; con-

sequently the offender's attempt to open it was futile. The armed man then raised the pistol and fired one shot into the menu signs which hung high on the wall behind the counter. Potter ducked behind the counter and lay on the floor until the offenders left the restaurant.

Bridgeview Police Officer Russell Harvey responded to the call from Brown's. Although several employees allegedly observed the robbery attempt, only Potter spoke to Officer Harvey on the night of the incident. According to Harvey's report, Potter described the *armed* offender as a "male Mexican, eighteen to nineteen years of age, wearing a red bandanna around his head, dark shoulder-length hair parted down the middle, having a dark moustache, dark complected, five foot-seven inches high, one hundred sixty-five to one hundred seventy pounds, possibly wearing high-heeled shoes." The report indicated that Potter described the *unarmed* offender as a "male Negro, nineteen to twenty years of age, five foot nine inches high, one seventy to one seventy five, having a close-cropped natural type hairdo, wearing a blue jean jacket." The record shows that defendant is a white male with a fair complexion. He was approximately 20 years old at the time of the robbery attempt. He is five foot seven inches tall and weighs approximately 165 pounds. He has brown hair, a moustache, long sideburns and green eyes.

Approximately three hours after the incident at Brown's, a Hickory Hills police officer observed defendant and two other men sitting in an automobile parked at a gas station located at 95th and Roberts Road in Hickory Hills, Illinois. The gas station was approximately three miles from the Brown's Chicken restaurant. Defendant was in the driver's seat, one Michael Contreras, a Mexican-American, was in the front passenger seat and one Jeffery Roberson, a white male, was in the rear seat. The police officer ordered the three men out of the car. A brief argument ensued between defendant and Contreras, and the officer noticed that Contreras placed "something" under his seat. Upon searching the vehicle the officer found that the object Contreras had placed under the seat was a "blue steel Rome revolver with white grips." The gun contained seven "live bullets" and one spent shell. A search of Contreras' person revealed eight "live bullets" in his pocket. All three men were arrested and charged with the armed robbery of a 7-11 store located in Hickory Hills which had occurred earlier on the night of October 5. In addition, Contreras was charged with unlawful possession of a weapon. Contreras pleaded guilty to the charge of armed robbery. The record does not indicate the disposition of the weapons charge against him. Roberson was tried and convicted of the armed robbery. Defendant was tried

and acquitted of this charge.

William Dapkus, a criminal investigator with the Bridgeview Police Department, had been assigned to investigate the attempt armed robbery of the Brown's Chicken restaurant. Upon hearing of the arrest of the three men in Hickory Hills, Dapkus arranged two physical lineups in which Contreras and Roberson were viewed by Potter. She was unable to identify either of them as having participated in the robbery attempt at Brown's.

On November 1, 1979, Officer Dapkus prepared an array of six photographs to be used in an identification procedure. Included in the array was a copy of the "mug shot" of defendant which had been taken by the Hickory Hills Police Department following defendant's arrest on October 6. The photograph depicting defendant was covered with a dull green film. The other five photographs in the array depicted five white males similar in height, build and age to defendant.

On November 1 Dapkus presented the array to Potter. She identified the photograph of defendant as depicting the armed offender in the attempted robbery of the Brown's Chicken restaurant. Later that same day Dapkus presented the array to Debbie DeMaso, another employee of Brown's Chicken who allegedly witnessed the attempted armed robbery of Brown's. DeMaso also identified the photograph of defendant as depicting the armed offender. Defendant was subsequently arrested and charged with the attempt armed robbery of the Brown's Chicken restaurant. Approximately two weeks after the witnesses' photo identification, at defendant's bond hearing, Potter, DeMaso and Dapkus sat in the spectator's section of the courtroom and observed the defendant as he was brought before the bench by the sheriff's deputies. On March 11, 1981, the day before trial in the instant case, Potter first identified a photograph of Contreras as depicting the unarmed offender who had participated in the attempted armed robbery of Brown's.

At trial in the instant case Potter again identified defendant as the armed individual who had attempted to rob Brown's. She testified that at the time of the attempt the restaurant was well lighted and that she stood directly in front of defendant during the incident. Potter estimated the attempt lasted approximately five minutes. On cross-examination Potter acknowledged that on the night of the incident she had described the armed individual to Officer Harvey as a "male Mexican" as his report indicated. At trial Potter added that the time of the attempt defendant was wearing white pants and that he had "collar or longer than collar length hair." Potter identified as the gun used in the armed robbery attempt the gun that had been re-

moved from the car in which defendant had been sitting in the Hickory Hills gas station.

Vicki Spoon, another employee of Brown's Chicken, testified that she was in the front of the restaurant at the time of the robbery attempt. She also identified the defendant at trial as the armed offender who had participated in the robbery attempt. She stated that she was approximately four feet from the defendant during the incident and that she ran into the back room of the restaurant after defendant fired the gun. She also stated that the gun admitted into evidence resembled the gun used by defendant. Ms. Spoon conceded that she did not give Officer Harvey a description of the offenders on the night of the incident. Nor did she participate in any pretrial identification procedure in connection with the instant case.

Debbie DeMaso testified in rebuttal for the State. She was "working the front counter" at Brown's on the night in question. She identified the defendant as the armed offender, and she stated that the gun admitted into evidence looked like the gun used in the armed robbery attempt.

Officer Harvey testified that Potter seemed "quite shaken" as he interviewed her shortly after the incident. Although his report indicated that Potter had described defendant as a male Mexican, Harvey testified that Potter had merely said that defendant "looked Mexican."

Defendant denied that he had participated in the attempt armed robbery of the Brown's Chicken. He claimed that on October 5, 1979, he had attended a birthday party in Palos Hills, Illinois, from approximately 8 p.m. until shortly after midnight. Contreras and Roberson were also at this party. Defendant explained that he left the party with Contreras and Roberson at approximately 12:15 a.m. to "get some beer" and that they were arrested in the gas station shortly thereafter. The gas station was located approximately one mile from the site of the party.

Defendant's sister, Sharon Goodman, and her boyfriend, Michael Principe, substantially corroborated defendant's alibi.

# I

Defendant first contends that the judgment entered on his conviction for armed violence was improper because the armed violence conviction constituted a double enhancement of the predicate felony of attempt armed robbery. Defendant argues that a single element—presence of a "deadly" weapon—served initially to enhance the charge of attempt robbery to the predicate felony of attempt

armed robbery and that the State then used the same element to enhance again the charge of attempt armed robbery to the charge of armed violence in violation of *People v. Haron* (1981), 85 Ill. 2d 261, 422 N.E.2d 627.

Initially we note that although attempt offenses are not classified as either misdemeanors or felonies (*People ex rel. Carey v. Scotillo* (1981), 84 Ill. 2d 170, 417 N.E.2d 1356), where an attempt offense is *punishable* as a felony such an offense may be treated as a felony for purposes of the armed violence statute. *People v. Gibson* (1981), 99 Ill. App. 3d 1068, 425 N.E.2d 1208; *People v. Kavinsky* (1981), 98 Ill. App. 3d 579, 424 N.E.2d 340.

In *Haron* the defendant was charged with armed violence where the predicate offense was aggravated battery based on the use of a deadly weapon. In reviewing the language of the armed violence statute (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2), the court concluded that the General Assembly did not intend that the presence of a weapon should serve both to enhance a misdemeanor to a felony and to support a charge of armed violence. The court stated:

> "In our opinion the requirement of section 33A-2 that there be the commission of a felony while armed with a dangerous weapon contemplates the commission of a predicate offense which is a felony without enhancement by the presence of a weapon." (*People v. Haron* (1981), 85 Ill. 2d 261, 278.)

Since, by virtue of the presence of a weapon, the offense of battery (a misdemeanor) had been enhanced to the offense of aggravated battery (a felony) and enhanced again to the offense of armed violence (a Class X felony), the court dismissed the armed violence charge. Our reading of *Haron* suggests that if the predicate offense is a felony by statutory definition when committed without possession or use of a dangerous weapon, such an offense may support the charge of armed violence.

■ In the instant case we believe the judgment entered on defendant's armed violence conviction, predicated on the offense of attempt armed robbery, was consistent with the reasoning of *Haron*. Here, unlike *Haron*, the offense of attempt robbery, even if committed without the use of a weapon, is punishable as a Class 3 felony. Since the armed violence statute provides that a person commits armed violence "when, while armed with a dangerous weapon, he commits *any felony* defined by Illinois Law" (emphasis added) (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2), it follows that an offender who utilizes a handgun in the course of his attempt to commit robbery is subject to the provisions of the armed violence statute. Accordingly

we conclude that defendant's conviction for armed violence based on the predicate felony of attempt armed robbery did not constitute an impermissible double enhancement in violation of *Haron*.

## II

Defendant next contends that the trial court erred in admitting into evidence a handgun which had been seized by the police from Michael Contreras. Defendant argues that since the gun had been found in the car under the seat in which Contreras had been sitting, "the link between the gun and defendant was tenuous ***."

It is well established that a weapon may be admitted in evidence where there is proof connecting it to the defendant and the crime, and it is not necessary to establish that the particular weapon in question was the one which was actually used. If it is shown that defendant, when arrested, possessed a weapon which could have been used in the commission of the crime charged, it may be admitted in evidence. (*People v. Johnson* (1966), 35 Ill. 2d 516, 221 N.E.2d 497; *People v. Williams* (1981), 96 Ill. App. 3d 8, 420 N.E.2d 710.) Here there was sufficient proof to connect the gun to both the defendant and the crime. The gun had been recovered from the same vehicle in which defendant was sitting in the gas station in Hickory Hills. Potter identified the gun admitted into evidence as the one defendant had used to commit the crime. Spoon and DeMaso identified the gun presented at trial as resembling the one used by defendant. Finally, when the gun was recovered, it contained one spent shell, and the record shows that one shot was fired during the robbery attempt at Brown's Chicken. In our opinion these facts establish a sufficient nexus between the gun, the defendant and the crime so as to render the gun probative and admissible. *People v. Daniels* (1976), 35 Ill. App. 3d 791, 342 N.E.2d 809.

## III

Defendant next contends that he is entitled to a new trial because the trial court allegedly erred in permitting the State to introduce evidence of another crime for which defendant had been charged and acquitted. We believe defendant's contention has merit.

The evidence to which defendant objects is a portion of the testimony of arresting Officer Gibbs concerning the circumstances of defendant's arrest at the gas station in Hickory Hills on October 6, 1979. Upon such arrest defendant was charged with the armed robbery of a 7-11 store which had occurred on the same night as the attempt armed robbery of Brown's Chicken which is involved in the in-

stant case. The following sequence of Officer Gibbs' testimony is the basis for defendant's objection:

On cross-examination defendant questioned Gibbs concerning the gun he had found under the front passenger seat of the automobile in which defendant, Contreras and Roberson had been sitting. Defendant asked Officer Gibbs the following question:

> Q. Do you remember, Officer, if Mr. Contreras was later charged with the criminal offense of possessing that gun, is that correct, to your knowledge?
>
> A. Yes, sir."

Seizing on defendant's question, the State, on redirect, asked Officer Gibbs, "What other offenses was Mr. Contreras charged with that night?" Defendant objected to the State's question, and a side bar ensued in which the State argued that by defendant's inquiry into the weapons charge against Contreras, defendant had "opened the door" to further inquiry regarding any other crimes with which Contreras may have been charged that night. The trial court agreed with the State and allowed the State to ask Gibbs:

> "Officer, what other crimes, if any, was Mr. Contreras charged with that night, when you recovered the gun in the car?
>
> A. I believe armed robbery, armed violence."

On re-cross-examination defendant asked Gibbs:

> Q. You testified that Contreras was charged with armed robbery and possession of a gun on that night, is that correct?
>
> A. Yes, sir.
>
> Q. Okay, the armed robbery that Mr. Contreras was charged with, does that armed robbery have anything to do with Brown's Fried Chicken on 80th and Harlem?
>
> A. I don't understand the question.
>
> Q. The armed robbery that Mr. Contreras was charged with, did that charge contain any reference to a Brown's Fried Chicken on 90th [sic] and Harlem?
>
> A. I don't believe so."

On further redirect the State inquired of Gibbs as follows:

> "Q. Officer, what time was the armed robbery committed that you were referring to in your answering the questions of Mr. Blumenthal?
>
> [Defendant]: My objection, and your Honor knows the basis for it.
>
> THE COURT: You have opened the door, overruled.
>
> [Officer Gibbs]: Approximately six minutes after twelve.

[State]: Of what date?

A. The 6th.

Q. That's the night of the fifth, and the early morning hours of the 6th?

A. Yes, sir.

Q. How many people were charged with that crime?

A. Three."

Finally, on further re-cross-examination defendant questioned Gibbs as follows:

"Q. Officer, three people were charged with that particular crime, is that correct?

A. 711?

Q. 711.

A. Yes, sir.

Q. And one of those people was James Goodman? Is that correct?

A. That is correct.

[State]: Objection.

THE COURT: Overruled.

[Defendant]: Was one of the people charged James Goodman?

[Officer Gibbs]: Yes, sir.

Q. And James Goodman was tried, was he not?

A. Yes, sir.

Q. And he was found not guilty, isn't this true?

A. Yes, sir."

As a general rule, evidence of other offenses which are separate and distinct from the crime for which a defendant is on trial is inadmissible. (*People v. Burage* (1961), 23 Ill. 2d 280, 178 N.E.2d 389, *cert. denied* (1962), 369 U.S. 808, 7 L. Ed. 2d 555, 82 S. Ct. 651; *People v. Bartall* (1982), 105 Ill. App. 3d 867.) Such evidence may be admissible, however, if it has probative value to establish a defendant's motive, intent, identity, absence of mistake, or *modus operandi*, and its probative value outweighs its prejudicial effect. (*People v. McCambry* (1979), 76 Ill. App. 3d 314, 395 N.E.2d 129.) Another exception to the general rule allows evidence of other offenses to be admitted where the evidence is "procured, invited, or acquiesced to by the defendant." (*People v. Baseer* (1980), 90 Ill. App. 3d 866, 414 N.E.2d 5.) Here the State relies on the latter exception to argue that defendant's initial question posed to Officer Gibbs concerning the weapons charge against Contreras "opened the door" to the evidence regarding the armed robbery of the 7-11 with which defendant was charged. Such reliance we believe to be misplaced.

■ Defendant's inquiry into the weapons charge against Contreras was relevant and proper because the gun was an important piece of physical evidence, and the question of its possession was probative of the nexus between the gun and the defendant. The scope of defendant's inquiry, however, was limited to a probative issue in the case. In our opinion the State's subsequent questioning of Officer Gibbs regarding the other charges which had been filed against Contreras was beyond the scope of defendant's inquiry. Since Contreras was not on trial in the instant case, evidence relating to the armed robbery and armed violence charges against Contreras for the 7-11 armed robbery was not probative of an issue in this case. We conclude, therefore, that it was error for the trial court to admit such evidence. Once the jury heard Officer Gibbs testify concerning the other charges against Contreras, it became necessary for defendant to counter the negative inferences created by such testimony. Defendant attempted to do so by eliciting the fact that the charges against Contreras did not stem from the attempt armed robbery of Brown's. The State, in turn, seized upon this fact to enlarge its inquiry and to educe the fact that three men had been arrested and charged with the 7-11 armed robbery. Under the circumstances in the case at bar, eliciting the fact that two other men had been arrested and charged along with Contreras was tantamount to eliciting evidence that defendant had been arrested and charged with the 7-11 robbery. We do not believe that defendant opened the door to such evidence, and we find that its admission was highly prejudicial to defendant.

The prejudicial effect of this evidence was compounded when during closing argument the State repeatedly implied that defendant was actually guilty of the armed robbery of the 7-11 even though defendant had been acquitted of this charge. The following comments made by the State are illustrative:

"[State]: *** People get bored sitting around a party all night. They want to do something for excitement. Maybe that's what they did, stick up a Brown's here and whatever the other place was. [Objection overruled.]

* * *

[State]: We don't contest the fact that the gun might have been carried on Mr. Contreras and it might have been Mr. Contreras' gun. So what? So what? When they stuck up the Brown's Chicken, it was his [defendant's] turn to use it. [Objection overruled.]

* * *

[State]: *** Counsel has made a big point about the fact that

he was found not guilty in that other crime. Well, consider the facts of the first crime, and consider the facts of the apprehension, three hours later. There is three people out there. Well, who is driving the car? It's fair to assume Mr. Roberson was driving the car, and I will explain why I think that was correct. Well, somebody had to drive the car in the first armed robbery. Somebody drove the car. He [defendant] drove the car. He was the driver. He's got to take a turn with the gun now. And that's what he did at Brown's, that's what he did at the Brown's Chicken. [Objection overruled.]

&ast; &ast; &ast;

[State]: He [defendant] was the driver of the car; he was never seen inside the place. That's why he was found not guilty.

[Defense counsel]: Objection, Judge. That's also—

THE COURT: I will sustain that objection."

The prejudice inherent in the State's foregoing remarks appears quite obvious. Although the State argues that defendant "opened the door" to these comments, we find nothing in defendant's closing argument which would invite the State to argue that defendant was actually guilty of a crime of which he had been acquitted. In our opinion the erroneous admission into evidence of another offense with which defendant had been charged and acquitted and the State's prejudicial comments during closing argument were sufficiently egregious to have deprived defendant of a fair trial.

## IV

Defendant next contends that the pretrial identification procedures employed in the instant case were impermissibly suggestive and that the identification testimony of Potter and DeMaso was tainted thereby. Defendant argues that the photo array arranged by Investigator Dapkus approximately three weeks after the attempt robbery of Brown's was suggestive because the photo depicting defendant was coated with a dark green film which made the color of defendant's complexion and hair appear darker than they actually are. Defendant maintains that, as a result, he was made to resemble Potter's description of the dark complected Mexican offender. Defendant also argues that it was impermissibly suggestive to allow Potter and DeMaso to view defendant as he was brought before the bench at his bond hearing conducted about two weeks after the photo identification.

The United States Supreme Court has often recognized that suggestive pretrial identification procedures can give rise to unreliable

identification testimony at trial. (*Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243; *Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375; *Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967.) The court's decisions have sought to establish standards which will ensure that the testimony given at trial is reliable and not so tainted by suggestive procedures as to make it likely that the witness has replaced the image of the perpetrator with that of the accused. *Manson v. Brathwaite* (1977), 432 U.S. 98, 112, 53 L. Ed. 2d 140, 152, 97 S. Ct. 2243, 2252.

In deciding whether to permit a witness to give identification testimony, a two-step process must be employed. The court must first determine whether the pretrial identification procedures employed were in fact suggestive. If the procedures are found to be suggestive, the trial court must next decide whether the identification testimony is so tainted as to be rendered unreliable. Factors to be considered by the trial court in determining the reliability of the in-court identification include the opportunity of the witness to view the criminal at the time of the crime, the witness' prior description of the criminal, the level of certainty demonstrated by the witness, and the time between the crime and the pretrial identification. (*Manson.*) The Illinois Supreme Court has adopted and applied the foregoing principles. *People v. Mc-Tush* (1980), 81 Ill. 2d 513, 410 N.E.2d 861.

■ With regard to the photographic array in the case at bar, we are of the opinion that defendant has not satisfied his threshold burden of proving that this procedure was impermissibly suggestive. (*People v. Blumenshine* (1969), 42 Ill. 2d 508, 250 N.E.2d 152.) Potter and DeMaso were shown an array of six photographs approximately three weeks after the robbery attempt. These photographs depict six white males of fair complexion and of similar height and build. The hair length of the individuals varied, and some of them had facial hair while others did not. Potter and DeMaso viewed the array independently of one another. There is no evidence to indicate that either of them was told about the progress of the investigation or that the police officer in any other way suggested which person in the array was under suspicion. Consequently, even though defendant's photograph is indeed tinted green, we do not consider this fact alone to be sufficient to establish that the photo array was impermissibly suggestive.

■ We next address defendant's contention regarding his appearance at the bond hearing. The record shows that Potter and DeMaso, accompanied by Officer Dapkus, sat in the audience section of the courtroom as defendant was brought before the bench by the sheriff's

deputies. Although the precise date of the bond hearing is not to be found in the record, it appears that the bond hearing took place approximately two weeks after the photo array was viewed by the witnesses and the defendant identified. The State does not suggest nor does the record disclose the reason for the presence in court that day of Potter and DeMaso. Indeed, our examination of the record suggests that Potter's and DeMaso's attendance at defendant's bond hearing was intentionally planned for the sole purpose of reinforcing the witnesses' photographic identifications. This type of confrontation is fraught with dangers of suggestibility because in this setting the defendant stands accused and is presented as one whom the State suspects of being guilty of an offense. (*Jackson v. Fogg* (S.D.N.Y. 1978), 465 F. Supp. 177; *United States ex rel. Ragazzini v. Brierley* (W.D. Pa. 1970), 321 F. Supp. 440.) Here the danger of suggestibility was exacerbated because the witnesses were accompanied by the police officer who was known by the witnesses to be investigating the Brown's Chicken incident. Under these circumstances we conclude that the witnesses' viewing of defendant at the bond hearing was impermissibly suggestive.

■ Having determined that the witnesses' viewing of defendant at the bond hearing was impermissibly suggestive, we nevertheless find that Potter's identification testimony at trial had a reliable basis independent of such suggestive confrontation. Potter testified that on the night in question the restaurant was well lighted, and she viewed defendant for approximately five minutes from a distance of approximately two feet. Although there are discrepancies between the description of defendant given by Potter to the police and defendant's actual appearance, these discrepancies can be explained, in part, by the police officer's failure accurately to transcribe Potter's description. Moreover, Potter's identification of defendant as the armed offender was unwavering. Given these facts we conclude that Potter's identification testimony was reliable and admissible.

■ With regard to DeMaso's identification testimony, we note that the record is devoid of evidence concerning the circumstances of her observation of defendant on the night of the attempt armed robbery. The record does not reflect the length of time she purportedly viewed defendant on the night in question. Nor did DeMaso give the police a description of defendant prior to her identification of him in the photo array or at the bond hearing. Once a court determines that identification testimony may be the product of a suggestive pretrial identification procedure, it becomes the State's burden to establish that the identification testimony has a basis independent of the sug-

gestive procedure. (*McTush.*) In the instant case we find that as to DeMaso's identification testimony, the State has not met this burden. Accordingly, it was error for the trial court to admit into evidence De-Maso's identification testimony. Since we have determined that DeMaso's identification testimony is inadmissible, we need not address defendant's contention that his cross-examination of DeMaso relative to such testimony was improperly limited.

## V

Defendant further contends that he was not proved guilty beyond a reasonable doubt. Defendant argues that Potter's identification testimony was totally impeached by the discrepancies between her description of defendant and his actual appearance. Specifically, defendant notes that Potter described defendant as dark complected while he is actually fair complected, she misdescribed his hair as shoulder length and parted down the middle, and she failed to mention defendant's "prominent 'mutton-chop' sideburns" and his "striking green eyes." Defendant further argues that Vicki Spoon's identification was not credible because she did not attempt to give the police a description of the offender on the night of the attempt robbery.

In a jury trial the credibility of the witnesses and the weight to be given their testimony are matters within the province of the jury, and a reviewing court will not substitute its judgment for that of the trier of fact unless the evidence is so unsatisfactory, improbable or implausible as to justify a reasonable doubt as to defendant's guilt. (*E.g., People v. Sanders* (1980), 86 Ill. App. 3d 457, 407 N.E.2d 951.) It is well established that where the identification of the accused is at issue, the testimony of one credible witness who had a good opportunity to view defendant under circumstances that would permit a positive identification is sufficient to sustain a verdict of guilty. (*E.g., People v. Rodriguez* (1980), 89 Ill. App. 3d 941, 412 N.E.2d 655.) Perfect conditions for observation need not be present nor must the time for observation be of a prolonged nature. (*People v. Reed* (1980), 80 Ill. App. 3d 771, 400 N.E.2d 688.) Where the witness makes a positive identification, precise accuracy in the preliminary description is not necessary. (*People v. Smith* (1977), 52 Ill. App. 3d 583, 367 N.E. 2d 756.) Accordingly, it is generally held that discrepancies or inaccuracies or omissions as to facial hair (*People v. Catlett* (1971), 48 Ill. 2d 56, 268 N.E.2d 378; *People v. Moore* (1977), 50 Ill. App. 3d 952, 365 N.E.2d 1356), or other facial characteristics (*People v. Miller* (1964), 30 Ill. 2d 110, 195 N.E.2d 694), are not fatal but simply go to the weight of the identification testimony. (*People v. Mendoza* (1978), 62

Ill. App. 3d 609, 378 N.E.2d 1318.) Applying the aforesaid criteria to the instant case, we believe the witnesses viewed defendant under circumstances which permitted them to make a positive identification. Both Potter and Spoon testified that they observed defendant for approximately five minutes in a well lighted place from a distance of approximately two to four feet. The sufficiency of their observation was a question of fact to be resolved by the jury. We find that even absent DeMaso's testimony, the State presented evidence which, if believed by the jury, was sufficient to support defendant's conviction.

Despite this conclusion we must take cognizance that defendant is entitled to a trial free from substantial prejudicial error. As we have previously articulated, we are compelled to conclude that the admission in evidence of the 7-11 armed robbery charge against defendant grievously prejudiced defendant's trial and may well have contributed to his conviction. This error, together with the State's remarks during closing argument that even though he had been acquitted defendant was actually guilty of the 7-11 charge, was sufficiently prejudicial to warrant granting defendant a new trial. For such reasons, therefore, we reverse defendant's conviction for armed violence and remand this cause for a new trial.

Reversed and remanded.

STAMOS, P. J., and HARTMAN, J., concur.