THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOHN CARTALINO (Impleaded), Defendant-Appellant.

First District (2nd Division)   No. 80—235

Opinion filed December 28, 1982.

Steven Clark and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, David A. Shapiro, and James J. Bigoness, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Defendant John Cartalino and codefendant Robert Bridges were charged with the offenses of murder, home invasion, burglary, attempted armed robbery and armed violence. Cartalino was tried by a jury while Bridges was tried in a separate but simultaneous bench trial. The trial was structured so that the jury heard evidence intended to relate primarily to the guilt or innocence of Cartalino. The State's witnesses were cross-examined by Cartalino's counsel in the presence of the jury. Bridges' counsel cross-examined them in the absence of the jury. Questioning of defense witnesses for Bridges and Cartalino followed a similar pattern.

Bridges was found by the court not guilty on all charges. Cartalino was convicted by the jury of murder, home invasion, armed violence, burglary and attempted armed robbery. The court imposed a natural life sentence for Cartalino's murder conviction. The principal issues on appeal include whether: Cartalino was proven guilty beyond a reasonable doubt; undue emphasis was given to a prior consistent statement of an accomplice witness when the statement was allowed into the jury room; and Cartalino's life sentence was constitutionally permissible.

For the reasons which follow, we affirm.

Barbara Colgan testified for the State. She was scheduled to meet the victim's girlfriend, Joyce Roscoe, for the purpose of working as a prostitute for Roscoe. At about 3:30 p.m. on that day, she, a man named Timothy Perkins, and Bridges, drove to a restaurant located at State and Division. She left them and walked to her appointment at 17 East Goethe, Chicago. At about 4 p.m., she rang the doorbell. Donald Ewing, the victim, opened the door and she told him of her appointment with Roscoe. She entered the apartment and stood to the left so that he could close the door. The victim looked "past" her and said, "What the shit is this?" Bridges came through the door with Cartalino directly behind him. Bridges pointed a silver revolver at the victim; Cartalino wielded a black automatic pistol. Bridges pulled out handcuffs from a clear plastic bag. Cartalino and Bridges told the victim to sit down and "shut up." They asked him, "Do you want to die, motherfucker?" The victim said "I'm already dead." A growling German shepherd ran towards them but stopped at the end of the hall. Colgan "panicked" and ran out of the apartment. At an alley about 20 feet from the building she heard four shots coming from inside the apartment.

Colgan returned to Perkins' apartment. Only Marilyn Perkins, Timothy's wife, was home. At about 4:28 p.m., she looked through the

window and saw Timothy Perkins running towards the house. She saw Cartalino on the driver's side and Bridges on the passenger side of a black Oldsmobile Cutlass parked on the street in front of the house. Timothy entered the apartment and had a conversation with her. She went home but did not remain there overnight. The next day she was with Marilyn and Timothy Perkins. On April 1, 1979, she had her mother call the police, spoke with various policemen at the station, and gave them the names of Marilyn and Timothy Perkins. When shown a group of males in eight black and white photographs, she identified Cartalino as the man she had seen in the victim's apartment. After giving her statement to police investigators on April 1 and 2, she was granted immunity from prosecution for any criminal matters other than perjury disclosed by her testimony.

Joyce Roscoe testified for the State. In March of 1979 she lived with the victim at the Goethe Street apartment. They were involved with call girls and sold cocaine. Marilyn Perkins worked as a prostitute for her. At about 3:30 p.m. on the day of the murder, she telephoned the victim at Irene Hyaz' apartment, asked him to go to their apartment to meet Colgan, and tell her she would be 15 or 20 minutes late. When Roscoe returned to their apartment at approximately 4:30 p.m., the door was wide open and the apartment smelled of smoke. Nothing was stolen but she found the victim lying on the floor.

Timothy Perkins testified for the State. During the second week of March 1979 he saw Bridges at his McClurg Street apartment. Bridges asked him if he knew of anybody who he could "stick up" that was "off into vice" and would not complain to police. Timothy responded that if he learned of anyone he would let him know. The Monday preceding March 29, at the McClurg apartment, Perkins told Bridges that he thought of someone Bridges could stick up and expect to find money, drugs, jewelry and possibly furs. He would try to get the address for him, which he did. He did not tell Bridges the name of the person who lived there. He told Bridges that he could not go with him because he knew the people.

Perkins later explained to Bridges that he knew Colgan had an appointment at that address on Thursday and they could probably get in by following her. He had known Colgan for a couple of weeks. At 10:30 a.m. on the day of the murder he went to Bridges' apartment. Bridges had a set of handcuffs, two ski masks and a nickel-plated revolver. Later he drove Colgan and Bridges to a restaurant at Division and State Streets. A few minutes after Colgan left for her appointment, he and Bridges began following her. Cartalino joined them and Bridges said Cartalino was going to go with him. Bridges handed Car-

talino a ski mask, but neither man wore them.[1] They walked north on State to Scott Street. He went east on Scott and last saw Bridges and Cartalino going north on State. He was going to go into the alley to wait as a lookout, but when he saw a delivery truck and workers there, he continued east on Scott. When he got to Scott and Astor, he heard two muffled gunshots. He could not tell where they came from. He heard three more louder shots.

Cartalino pulled up in a black Oldsmobile driven by Bridges. He got in the back seat. Bridges asked if he saw "the girl." Cartalino told him that they had to find her because she could get them all "busted." Bridges said they had to "pop the guy," and Cartalino said "he did, too," three times. Cartalino showed Perkins that his gun clip was missing three cartridges. They drove around the block unsuccessfully looking for Colgan, and went to Perkins' apartment 10 or 15 minutes later. While Bridges and Cartalino remained in the car, Perkins entered his apartment. He told Colgan that they were going to kill her and that she should hide in the basement. He went back and told Bridges and Cartalino that Colgan had not returned, but had called and said she was going to a motel and would call back later. Bridges said that he would keep in touch and Cartalino said that they had to kill her. Colgan remained at his apartment that night. The next evening he took Colgan and Marilyn to O'Hare Airport and left them at a terminal. The following morning, he picked up Colgan and his wife at a motel near the airport.

On cross-examination, Perkins stated that the charges of murder, home invasion, burglary, and attempted armed robbery lodged against him would be reduced for his testimony. His lawyer told him his sentence would be five years. He was going to do 2½ years, counting the six months he already had in. He got "three to nine" for possession of a controlled substance on August 14, 1974, and "one year to one year and a day" for unlawful use of weapons on April 17, 1978. He was on parole from his narcotic conviction when he was arrested in the instant case. On redirect examination, the State asked Perkins about his court-reporter statement of April 2, 1979, a statement given months before he was "promised" five years. The statement, as elicited during redirect examination, concerning the formulation and execution of the crime, was essentially consistent with his prior in-court testimony.

---

[1]In his written statement of April 2, 1979, Perkins said both men had ski masks on. At trial, Perkins stated that the word "on" was a mistake.

The physician who performed the autopsy on the body of the victim testified that she found seven gunshot wounds of entrance and six of exit.

An investigating police officer, Ronald Gates, stated that on the day in question he searched the victim's apartment but found nothing unusual other than a German shepherd hiding behind the toilet in the bathroom. He noticed no signs of forcible entry and the apartment was not in disarray. Officer Thomas Beland, a member of the criminalistics division of the Chicago Police Department, stated that he arrived at the scene at 5:18 p.m. He identified People's Exhibit No. 18 as an envelope containing two handcuff keys on a ring which were similar to the handcuff keys he recovered from the floor of the apartment. He found no handcuffs.

Several spent bullets, metal fragments and .380 cartridge casings were recovered and introduced into evidence at trial. A firearms examiner testified that the three cartridge casings recovered from the victim's apartment were determined to have been fired from the same gun. Three of the recovered bullets were fired from an automatic .380 caliber having six lands and grooves inclined to the right. It was not possible to determine whether the .380 automatic bullets came from the three .380 cartridge casings. The two .38 special revolver bullets were fired from the same weapon. Such bullets may be fired from either a .38 special revolver or a .357 revolver. No ammunition similar to that found in People's Exhibit No. 26 was submitted to him in regard to this case. A homicide investigator testified that he found six live rounds of .38 round nose ammunition, identified as People's Exhibit No. 26, in Bridges' coat pocket when the latter was arrested.

Homicide Investigator Hans Hietmann stated that on April 2, 1979, he observed a 1978 or 1979 black Oldsmobile in front of 5918 West 88th Place, Oak Lawn, which was believed to be the home of defendant. They met a woman there who identified herself as defendant's mother. On April 9, 1979, Cartalino was arrested at 2332 West 22nd Street. The same black Oldsmobile that was parked in Oak Lawn was now parked in front of this latter address. It was stipulated that if a State's witness, Andrew DiBrowski, were called to testify he would state that he resided at 2329 West 22d Place, and on four different occasions had observed Cartalino inside the Oldsmobile at which times the vehicle was always in front of 2322 West 22d Place.

Irene Hyaz, a call girl, testified for Cartalino. She had indirect knowledge that Ronald Birch and Barry Fischer dealt with the victim in drugs. The three were friends. They had a disagreement two

months before the victim's murder, because they believed he had informed on them. She "heard" they made "threats." Two additional witnesses testified on behalf of Bridges only. One witness testified in essence, on the basis of measurements he made, that the shortest possible distance from the rear of 17 E. Goethe to Astor and Scott was 250 feet. A building manager for the McClurg Court Apartments testified that Bridges did not move in until March 23, 1979, but could have had access to the apartment any time after March 19, 1979.

The State was allowed to reopen its case. An Oak Lawn police officer testified that the day before trial he went to Cartalino's home and spoke with his parents. Cartalino was not present at that address, nor did he know where he was. Cartalino was absent during the course of the trial.

In acquitting Bridges, the circuit court found: the testimony of Perkins and Colgan was not credible; it was improbable that Perkins would seek the help of Bridges or Cartalino to rob the victim; and that Perkins was the "individual who was the shooter." The court, however, expressly stated it was not determining the guilt or innocence of Cartalino.

I

■ A. Cartalino maintains that the State failed to prove him guilty beyond a reasonable doubt, since the evidence of Bridges' guilt was at least as great as the evidence tending to prove his guilt. He contends that in both cases, the State relied exclusively on the testimony of Perkins, an accomplice witness, and Colgan, a partially immunized witness, to prove the guilt of the codefendant and defendant himself. Cartalino emphasizes that in acquitting Bridges, the circuit court made no reference in his findings to any evidence which was not common to both trials. He argues that since the State's cases against Bridges and himself depended equally on the trier of fact's assessment of Perkins' and Colgan's credibility, and the finding of the circuit court as to Bridges expressly questioned their credibility, the inconsistent verdict as to him cannot be tolerated.

The failure to convict one codefendant does not raise a reasonable doubt as to the guilt of the other codefendant unless it is demonstrated that the evidence against both defendants is *identical* in all respects. (*People v. Vriner* (1978), 74 Ill. 2d 329, 343, 385 N.E.2d 671; *People v. Stock* (1974), 56 Ill. 2d 461, 465, 309 N.E.2d 19. See Annot., 22 A.L.R. 3d 717 (1968).) Where there is the slightest difference in the evidence as between codefendants, the acquittal of one does not raise a reasonable doubt as to the guilt of the other. (*People*

*v. Hobson* (1979), 77 Ill. App. 3d 22, 26, 396 N.E.2d 53.) In the instant case, the evidence against both defendants was dissimilar for several reasons.

First, only Bridges introduced evidence which established the unlikelihood of Perkins having met Bridges in the McClurg apartment during the second week of March. Second, only Bridges introduced defense evidence tending to show that it was improbable that Perkins heard the shots fired from his alleged position on the street. This evidence was especially damaging to the State's case, since it undercut the credibility of one of the State's key witnesses, Perkins. Third, the State introduced evidence of defendant's absence from the courtroom and home from which the jury could have reasonably inferred a consciousness of guilt. Fourth, a statement made by Cartalino to Perkins in the lockup after their arrest was admitted only as to Cartalino, to the effect that the latter told Perkins that when he got out, he would kill Bridges and Colgan, and that he knew Bridges "gave him up." Further, the inculpatory evidence of Cartalino's guilt was stronger. His auto was identified as that used to leave the scene of the crime. He was seen with the black automatic handgun. He reported that he shot the victim three times and revealed the gun clip which was missing three cartridges. A bullet from an automatic handgun was found under the victim's head in a pool of blood. We are compelled to conclude that the acquittal of Bridges did not raise a reasonable doubt as to the guilt of Cartalino under these circumstances. *People v. Vriner* (1978), 74 Ill. 2d 329, 343; *People v. Hiller* (1980), 92 Ill. App. 3d 322, 326, 415 N.E.2d 1202.

The cases cited by Cartalino, *e.g., People v. Perez* (1980), 82 Ill. App. 3d 1007, 403 N.E.2d 688, and *People v. Beasley* (1976), 41 Ill. App. 3d 550, 353 N.E.2d 699, are distinguishable because in those cases the evidence against convicted defendant(s) was no stronger than the evidence against the acquitted codefendant. Cartalino's reliance on *People v. Patterson* (1972), 52 Ill. 2d 421, 288 N.E.2d 403, is also misplaced. In *Patterson* the supreme court simply held that the uncorroborated testimony of the State's key witness, contradicted in part by defendant and three other witnesses, was sufficiently improbable as to raise a reasonable doubt as to defendant's guilt. In contrast, here, Cartalino's absence from the trial and the largely consistent testimony of Perkins and Colgan, corroborated in part by the testimony of Roscoe, Officers Gates and Beland, Investigator Heitmann, the firearms examiner, the physical evidence, and the stipulation of DiBrowski, amply supported the jury's verdict. Cartalino's argument, that Perkins' testimony was uncorroborated or that the State

relied exclusively on the testimony of Colgan and Perkins to establish defendant's guilt, must be rejected.

■■ B. Cartalino urges that Perkins and Colgan had ample opportunity and time to fabricate a consistent explanation for the death of the victim that would shift the major responsibility from themselves. He emphasizes that Perkins was an accomplice and Colgan was partially immunized and argues that their testimony was fraught with improbabilities and failed to prove him guilty beyond a reasonable doubt. Colgan's testimony was supported by her April 2, 1979, statement which was given before any immunity was granted. Perkin's testimony was also supported by his earlier statement which was recorded well before he was "promised" leniency. Despite their opportunity to fabricate and the purported inconsistencies therein, the jury properly may have found the partially corroborated testimony of Perkins and Colgan credible and that such testimony and other evidence proved Cartalino guilty beyond a reasonable doubt. *People v. Ellis* (1978), 74 Ill. 2d 489, 496, 384 N.E.2d 331; *People v. Farnsley* (1973), 53 Ill. 2d 537, 544-45, 293 N.E.2d 600.

## II

■■ A. Cartalino maintains that the six live rounds of .38 round nose ammunition found in Bridges' pocket when he was arrested in his apartment three days after the incident was improperly admitted into evidence as People's Exhibit No. 26. He argues that there was no evidence connecting these bullets to either the offenses charged or himself; therefore, their admission served no purpose other than to persuade the jury that Cartalino and Bridges were the kind of men likely to have committed the crimes charged. Cartalino also emphasizes, in effect, the firearms examiner's testimony that no ammunition similar to that found in People's Exhibit No. 26 was submitted to him in regard to this case.

Physical evidence may be admitted provided there is proof to connect it with the defendant and the crime. (*People v. Tribbett* (1968), 41 Ill. 2d 267, 270, 242 N.E.2d 249.) It is not necessary to show that an object admitted in evidence was actually used; however, the object at least must be suitable for the commission of the crime. (*People v. Miller* (1968), 40 Ill. 2d 154, 159, 238 N.E.2d 407.) The ammunition in question was properly admitted into evidence because of the proof connecting it with the crime and defendant. The same weapon in this case, a .38 special revolver, could fire both the .38 bullets recovered in the victim's apartment and .38 round nose ammunition found in

Bridges' coat pocket. The fact that the latter type of ammunition was found in Bridges' coat would allow the jury to infer that Bridges had access to the type of gun used in the incident. Since the ammunition was connected to the offense and since there was evidence that Cartalino participated in the offense, the ammunition was properly admitted. See *People v. McClinton* (1978), 59 Ill. App. 3d 168, 176, 375 N.E.2d 1342; *People v. Dixon* (1976), 36 Ill. App. 3d 247, 253-54, 343 N.E.2d 583.

■ Cartalino appears to argue that the evidence showing that Bridges was in possession of these bullets was evidence of other crimes, but he does not articulate how the mere possession of bullets by itself indicates the existence of "other crimes"; nor does he identify the specific nature of the crimes generally asserted. Assuming, *arguendo*, that the bullets were indicative of other crimes, they were still admissible if relevant for any purpose other than to show propensity to commit a crime (*People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489), provided that the probative value outweighs any prejudicial effect. (*People v. Triplett* (1981), 99 Ill. App. 3d 1077, 1082, 425 N.E.2d 1236.) The range of purposes for which evidence of other crimes is admissible is broad. (McCormick, Evidence sec. 190, at 447-48 (2d ed. 1972); E. Cleary and M. Graham, Handbook of Illinois Evidence sec. 404.5, at 134-35 (3d ed. 1979).) Here, as noted above, the .38 bullets were probative on the issue of whether Bridges had access to the type of gun employed in the commission of the crime. Accordingly, the circuit court did not abuse its discretion in allowing the bullets to be received into evidence (*People v. Johnson* (1981), 97 Ill. App. 3d 1055, 1068, 423 N.E.2d 1206) and into the jury room. *People v. Allen* (1959), 17 Ill. 2d 55, 62-63, 160 N.E.2d 818.

■ B. The following comment in the prosecutor's closing argument is identified by Cartalino as improper:

"Then there are the little things that counsel was referring to; the .380 bullets found in the jacket of the defendant Bridges. I ask you to consider what types of people carry .380 bullets. I submit to you that there are only two types; on is a [*sic*] law enforcement officers who are authorized by statute to carry bullets and the second type are people who create the necessity for the first type. People like Bobby Bridges and Johnny Cartalino, killers."

Cartalino neither objected to this comment at trial nor in his post-trial motion; the matter therefore has been waived. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) Assuming that this issue had been properly preserved on review, such error nonetheless would not

warrant reversal. *People v. Nilsson* (1970), 44 Ill. 2d 244, 248, 255 N.E.2d 432.

■ C. Cartalino assigns error to the admission of hearsay evidence regarding the black Oldsmobile purportedly driven by him showing that it had been registered to a fictitious person. Investigator Heitmann testified that the vehicle was registered to a Susan Drann at a certain address. No driver's license had ever been issued to a Susan Drann. Cartalino maintains that this evidence tended to prove only that he was a person of bad character likely to commit a murder. This issue was waived by his failure to object at trial or to include it in his post-trial motion. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282-83.) His reliance on *People v. Figueroa* (1975), 30 Ill. App. 3d 656, 333 N.E.2d 586 (abstract), misses the mark, since in that case only incompetent evidence was adduced to prove an essential element of the crimes involved therein, theft and "tampering." Because the incompetent evidence here involved a collateral matter and because, at trial, defense counsel in effect expressed his willingness to stipulate to "what they have" from the Secretary of State's office, we cannot conclude that the admission of such evidence, under the circumstances of this case, constituted plain error. *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233; *People v. Pickett* (1973), 54 Ill. 2d 280, 282-83.

### III

■ Undue emphasis is claimed by Cartalino to have been given to the prior consistent statement of Perkins because the jury was permitted to take the statement into the jury room during its deliberations. He acknowledges, as he must, that a prior consistent statement is admissible where, as here, the witness is charged with having a motive for testifying falsely and the prior consistent statement was made before the alleged motive existed. (*People v. Powell* (1973), 53 Ill. 2d 465, 474-75, 292 N.E.2d 409.) But he maintains that "this tactic" unfairly bolstered Perkins testimony. This issue was waived by his failure to include it in his written motion for a new trial. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282-83.) In the absence of waiver, we would still find the assertion without merit. Whether or not an exhibit may be taken to the jury room rests within the sound discretion of the circuit court and its ruling, absent an abuse of discretion, will not be disturbed on appeal. (*People v. Allen* (1959), 17 Ill. 2d 55, 62-63, 160 N.E.2d 818; but *cf. People v. Carr* (1977), 53 Ill. App. 3d 492, 368 N.E.2d 128.) A court may allow the jurors to take with them writings which have been duly admitted into evidence. (*People v. Dixon* (1978), 58 Ill. App. 3d 557, 561, 374 N.E.2d 900; *Wilkinson v. Mullen* (1975),

27 Ill. App. 3d 804, 808-09,. 327 N.E.2d 433.) The circuit court here did not abuse its discretion or prejudice defendant's rights by allowing the statement, duly admitted, into the jury room.

## IV

Cartalino maintains that he was denied due process by the following colloquy during the State's closing argument:

"[State's Attorney]: *** Cartalino has the right to be proven guilty beyond a reasonable doubt, that is true, that is the burden in every single criminal case in this country and the Cook County Jail and the Illinois State Penitentiary are filled with people who have been proven guilty beyond a reasonable doubt.

Mr. Bailey [defense counsel]: Objection to that, that has no bearing on this case.

The Court: Overruled. Would you conclude?

[State's Attorney]: There is nothing, ladies and gentlemen, that makes the crime of murder or any of the other crimes involved here that raises that burden of proof."

The State observes that the challenged comment was made after defense counsel stated in closing argument:

"When I'm through, the Judge is going to tell you that the burden of proof is on the State and he's going to tell you that before you can find an individual guilty of a crime, in fact, you got to be convinced beyond a reasonable doubt. That is very much what I said when I said you have to be happy in your hearts and in your souls."

The right to assert the alleged error was waived because defendant failed to include his objection in his post-trial motion. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282-83.) Assuming the issue was properly before this court, however, the error complained of does not warrant reversal (*People v. Smith* (1981), 93 Ill. App. 3d 1133, 1139, 418 N.E.2d 172; *People v. Hamilton* (1980), 80 Ill. App. 3d 794, 400 N.E.2d 599; *People v. Ayala* (1981), 96 Ill. App. 3d 880, 422 N.E.2d 127; but *cf. People v. Martinez* (1979), 76 Ill. App. 3d 280, 395 N.E.2d 86), particularly in light of defense counsel's closing argument equating being "happy in your hearts and souls" with being convinced beyond a reasonable doubt. *People v. Dixon* (1982), 91 Ill. 2d 346, 350-51, 438 N.E.2d 180; *People v. Vriner* (1978), 74 Ill. 2d 329, 344.

## V

A. The conviction for armed violence based on the predicate offense of attempted armed robbery must be vacated, is next main-

tained by Cartalino. The State responds that this contention is not appealable, because a sentence was never imposed on the armed violence conviction. Thus, the State asserts, there was no final judgment from which defendant can appeal. We disagree. Although the final step in a criminal judgment is the sentence (*People v. Allen* (1978), 71 Ill. 2d 378, 381, 375 N.E.2d 1283), the absence of sentence on one of two or more defendant-appealed convictions is not a jurisdictional defense. (*People v Dixon* (1982), 91 Ill. 2d 346, 353.) Since Cartalino has properly appealed his murder conviction, and since the failure to impose a sentence upon the armed violence conviction was intimately related to an "dependent upon" the appealed convictions within the meaning of Supreme Court Rule 615(b)(2) (73 Ill. 2d R. 615(b)(2)), this court has jurisdiction to consider defendant's claim. *People v. Dixon* (1982), 91 Ill. 2d 346, 353-54; see *People v. Lilly* (1974), 56 Ill. 2d 493, 496, 309 N.E.2d 1.

■ Cartalino urges that the presence of a dangerous weapon during the commission of an attempted robbery cannot enhance an attempted robbery offense from a Class 3 felony to a Class 1 felony and also serve as the basis for a charge of armed violence. (See Ill. Rev. Stat. 1977, ch. 38, pars. 8—4(c), 18—1, 18—2, 33A—2.) Therefore, he argues, his armed violence conviction cannot stand. A similar defense argument was raised and rejected in *People v. Goodman* (1982), 109 Ill. App. 3d 203, 208-10, 440 N.E.2d 345, where we held that a conviction for armed violence based on the predicate felony of attempted armed robbery did not constitute an impermissible double enhancement in violation of *People v. Haron* (1981), 85 Ill. 2d 261, 422 N.E.2d 627. For the reasons set forth in *Goodman,* we find defendant's argument unpersuasive.

■ B. The State claims that Cartalino was sentenced solely on the murder conviction and requests this court to remand the cause for imposition of sentences on all convictions. At the sentencing hearing, however, the State simply requested that defendant "be sentenced to natural life"; it did not seek the imposition of separate sentence for each conviction. Nor did the State object when the court failed to impose separate sentences. Under these circumstances, the State has waived the right to assert this issue on appeal. *People v. Szudy* (1982), 108 Ill. App. 3d 599, 606, 439 N.E.2d 137; *cf. People v. Garner* (1981), 102 Ill. App. 3d 755, 758, 430 N.E.2d 320.

## VI

■ A. The Unified Code of Corrections (Code) (Ill. Rev. Stat. 1979, ch. 38, par. 1001—1—1 *et seq.*) is claimed by Cartalino to con-

tain no basis for distinguishing between those offenders who qualify for an extended term only and those who are to be imprisoned for natural life. He observes that under section 5—8—1(a)(1) of the Code (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)) the court may sentence a defendant convicted of murder to a term of natural life if it finds that "the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." He further notes that under the extended-term provisions (Ill. Rev. Stat. 1979, ch. 38, pars. 1005—8—2(a)(1), 1005—5—3.2(b)(2)), a court may sentence a defendant guilty of murder to a term of not less than 40 years and not more than 80 years if it finds that "the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Therefore, Cartalino contends, a circuit court has, in violation of the equal protection clause, totally unbridled discretion to sentence a defendant convicted of murder to a term of natural life rather than an extended term based on the identical finding that the murder was exceptionally brutal and heinous. This argument has been waived, since it was not raised by defendant at either the sentencing hearing or in his motion for a new trial. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282-83.) Assuming there had been no waiver, the merits of defendant's contention are unsupportable.

Section 5—8—1(a)(1) of the Code (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)) does not permit the court to impose a sentence of natural life solely on the basis of the seriousness of the offense committed (*People v. Smith* (1980), 91 Ill. App. 3d 438, 449, 414 N.E.2d 1281) without regard to a defendant's rehabilitative potential. (*People v. Merchel* (1980), 91 Ill. App. 3d 285, 295, 414 N.E.2d 804.) In determining a proper sentence for any felony, including murder, factors in aggravation and mitigation must be considered (*People v. Bartik* (1981), 94 Ill. App. 3d 696, 703, 418 N.E.2d 1108; *People v. Merchel* (1980), 91 Ill. App. 3d 285, 295) "as well as any other such factors as the judge shall set forth on the record that are consistent with the purposes and principles of sentencing set out in the Code." (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(b). See Ill. Rev. Stat. 1979, ch. 38, par. 1005—4—1.) Among aggravating factors listed are whether: defendant received compensation for committing the offense; defendant has a history of criminal activity; and the sentence is necessary to deter others from committing the same offense. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(a).) Mitigating factors are set forth in section 5—5—3.1(a). Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.1(a).

Cartalino's argument ignores the aggravating and mitigating factors—as distinct from a finding of brutal conduct—which the Code

mandates a circuit court to weigh before imposing any sentence, including one for natural life or an extended term. It is the presence or absence of the specified statutory factors which determine the nature of the sentence imposed on a defendant found guilty of a brutal and heinous murder. It cannot be concluded, from the foregoing, that a circuit court has the totally unbridled discretion to sentence a defendant to natural life or to an extended term. We conclude, therefore, that Cartalino has failed to overcome the strong presumption of the statute's constitutionality (*People v. La Pointe* (1981), 88 Ill. 2d 482, 499, 431 N.E.2d 344), even had there been no waiver.

■■ B. The final contention raised by Cartalino is that the United States Constitution bars imposition of a natural life term based on the finding of an aggravating factor which was not found to exist by a unanimous jury at the death penalty hearing. The circuit court imposed a term of natural life, in part, because, "*** of the finding of the jury in this case, who have found the facts to be that John Cartalino did commit this murder and that the offense was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty." At the end of the death penalty hearing, the jury could not unanimously find an aggravating factor was present so as to qualify defendant for imposition of the death penalty. Specifically, Cartalino maintains that the jury could not unanimously conclude that the victim "was killed by the defendant and not by another party to the crime." He argues that application of the doctrine of collateral estoppel requires that the sentence of natural life imprisonment, to the extent that it is based on the finding of the existence of an aggravating factor, be vacated and the cause remanded for new sentencing.

The State argues that this issue was waived since it was not raised by defendant at his sentencing hearing or in his post-trial motion. Assuming, for the purpose of argument, that the point had been properly preserved, Cartalino's position cannot be sustained. The doctrine of collateral estoppel bars relitigation of an issue of ultimate fact that has been determined by a valid and final judgment. (*People v. Ward* (1978), 72 Ill. 2d 379, 382, 381 N.E.2d 256.) In criminal cases, collateral estoppel is not to be applied in a hyper-technical fashion, but with an eye toward realism and rationality. (*People v. Ward* (1978), 72 Ill. 2d 379, 384.) The fundamental problem with Cartalino's estoppel argument is that the jury here did not affirmatively find that the aggravating factor did not exist (*People v. Hipkins* (1981), 97 Ill. App. 3d 174, 423 N.E.2d 208); it simply was unable to make an express finding either way on the factual question. Therefore, we find that the principles of collateral estoppel do not apply in the instant

controversy.[2]

For the reasons set forth above, no basis for disturbing the jury verdict or sentences exist. Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

STAMOS, P.J., and PERLIN, J., concur.

---

[2]A natural life sentence may be given "if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or that any of the aggravating factors listed in subsection (b) of Section 9—1 of the Criminal Code of 1961 are present." (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1).) Thus, the court, in a proper case, may impose a natural life sentence even if none of the aggravating factors are present.