THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY DIXON, Defendant-Appellant.

First District (5th Division)   No. 83—1503

Opinion filed June 7, 1985.—Rehearing denied July 15, 1985.

James J. Doherty, Public Defender, of Chicago (John Lanahan, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Donna B. More, and Theodore Gailan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

Following a jury trial, defendant was convicted of rape, deviate sexual assault and armed robbery and sentenced to concurrent terms of 25 years for armed robbery, 50 years for rape, and 50 years for deviate sexual assault. On appeal, he contends that (1) the trial court improperly denied his motion to suppress a lineup identification; (2) the State did not prove beyond a reasonable doubt that he was one of the offenders; (3) he was denied a fair trial by the allowance of evidence concerning the arrest of a codefendant whose case had been severed; (4) he was denied due process, by the jury's out-of-court experiment regarding identification; and (5) the 50-year extended sentences for rape and deviate sexual assault were improper.

At the suppression hearing, defendant testified that he was arrested on November 17, 1981, in the criminal court building while accompanied by Xavier Velasco, the public defender representing him in a rape case before Judge Pincham. He was told by the officers that they had an arrest warrant for rape. He admitted that his attorney (Velasco) read the *Miranda* warnings to him at the time of the arrest. He did not ask Velasco to accompany him to the police station for the lineup, nor did he ask to have another attorney present, even though Velasco told him that he had that right.

Officer Slattery testified that after the arrest of codefendant Harold Wilson on September 27, 1980, and the subsequent photo identification of defendant by the complainant, he went before Judge DiVito on October 1, 1980, and obtained a warrant for defendant's arrest. He executed that warrant on November 17, 1981, at approximately 10:30 or 10:45 a.m. outside Judge Pincham's courtroom and conducted a lineup at the seventh district police station at 1:30 p.m. of that same day. Officer Slattery stated on cross-examination that

Velasco advised defendant of his rights at the time of the arrest and that he (Slattery) told Velasco that he intended to hold a lineup at the station. Later that day, he phoned Velasco's office and told the person who answered that defendant's lineup would be held that day at the seventh district police station at 1:30 p.m. There was no attorney present on defendant's behalf at the lineup.

Velasco testified that he was present when defendant was arrested, that he personally advised defendant of his rights, and that Officer Slattery did inform him that he intended to conduct a lineup, but that he did not go to the police station for the lineup because he was the only public defender in the courtroom that day. He also stated that he did not receive the message from Officer Slattery regarding the exact time the lineup would be held. The motion to suppress the lineup identification was denied.

At trial, complainant—an elementary school teacher—testified that on September 20, 1980, she was returning to her mother's house after having dinner with several other teachers, and when she reached the front door of her mother's building, two men pushed her into the front hallway and up against the mailboxes. As she was standing facing the two men, defendant took her necklace and her earrings. At this time, she was face-to-face with him and about a foot away. The other man, whom she identified as codefendant Harold Wilson, hit her in the face with his fist and then held a knife to her neck, telling her, "This is for real, bitch." One of the two men removed the rings from her hand and took her purse, after which defendant told her to drop to her knees; but after Wilson noted that they could be seen from the street, defendant told her to unlock the door to the inner hallway. While she tried to find the key, Wilson hit her again. The men then pushed her down the hallway to the foot of the stairway, where defendant told her to remove her clothes and kneel down. He then forced her to perform a deviate sexual act for about 15 minutes while telling her precisely how to do it. As she did this, Wilson again hit her in the face with his fist. After defendant finished, Wilson forced complainant to perform the same deviate sexual act for another 10 to 15 minutes. Defendant then forced her to perform another deviate sexual act, and at the same time Wilson again hit her in the face. Both defendant and Wilson then raped her. While Wilson raped her, defendant again forced her to perform a deviate sexual act. She was then forced to lie down in Wilson's urine, with her dress pushed into her mouth and her hands and feet tied together with her stockings, and as they were leaving one of the men kicked her in the side. As soon as the door locked behind them, she broke the nylons, took

the gag out of her mouth, and ran to the door, where she saw them throw her house keys across the street and start down the street. She ran upstairs and told her mother that she had been raped. Her mother called the police, who took her to Jackson Park Hospital, where she was examined. Complainant also testified that on September 27, 1980, she and her husband, accompanied by his brother and a friend, went to the Toast of the Town lounge to look for the men who had raped her. She pointed Wilson out, and Allan Hudson—one of the men with her party who was a guard for the Cook County Sheriff's Department—took him from the bar with the assistance of complainant's husband. Complainant went to the police station after Wilson's arrest and selected defendant's picture from five or six photographs shown her by Detective Slattery. She also identified defendant from among four or five men at a lineup on November 17, 1981.

She did not remember giving a description to the officers at her mother's house, but she did so later at the hospital. She estimated that defendant was approximately 24 or 25, about 6 feet or 6 feet 1 inch, and weighed 160 to 170 pounds. She did not tell the officers that he was limping. She did testify that she did not watch defendant walk at any point during the incident and that she only looked at the knife for a few seconds, describing it has having a "silver blade."

Complainant's mother testified that when she opened the door to see her daughter on the night of the rape, her daughter's face was battered and bruised and her hair and clothing were in disarray.

Complainant's husband testified that he came over to her mother's house on the morning of September 20, 1980, and saw that his wife's eyes were swollen and that she had abrasions on the left side of her cheek. He, Allan Hudson, and Allan Rockemore accompanied complainant to several bars in an attempt to find the rapists. She identified Wilson in one of the bars, and they detained him until the police arrived.

Allan Hudson, a Cook County deputy sheriff, testified that on September 27, 1980, he—with complainant's husband and Rockemore—detained Wilson until the police arrived. He frisked Wilson while they waited, and found that he had a pocket knife with a yellow handle.

Officer Ambrose testified that she answered the call from the group at the Toast of the Town lounge and took Harold Wilson into custody. She was given the pocket knife, describing it as a "small pocket knife with a yellow handle, yellow plastic handle" and a blade that was approximately four inches long. After she turned Wilson over to Detective Slattery, she completed her paperwork—which in-

cluded inventorying the knife found on Wilson. The knife was subsequently destroyed by mistake.

Detective Slattery testified that he showed complainant an array of five photographs, from which she identified defendant, and after his arrest on November 17, 1981, complainant also made a positive identification of him at a lineup. He stated that at the hospital complainant did not describe either of her attackers as having a beard, a mustache, or a peculiar type of hairline. She described one of the offenders as being over 6 feet tall, or approximately 6 feet 1 inch.

Defendant testified that he was 6 feet 5 inches, 26 years of age, and had a scar on his upper lip. He also said that he has the same goatee, mustache and sideburns that he had in 1980, and that he has had a beard and mustache continuously since July 1979. He was shot in the chest and the right foot on August 22, 1980, during an armed robbery and was still limping in September 1980. The bullets were not removed until June 1982.

Officer Moore testified that he spoke to complainant at her mother's home shortly after the rape. She described the taller man as approximately 6 feet 1 inch and did not mention that either man had a beard, mustache, or a peculiar hairline.

Dr. Gian Francisco testified that in June 1982, Dixon was referred to him to have a bullet removed from underneath the skin of his chest. He also removed a bullet which was immediately under the skin near the heel of Dixon's right foot. Dixon limped when Dr. Francisco watched him walk, and he said that it was his professional opinion that the bullet in defendant's foot could cause problems with walking. He agreed that 18 to 22 months earlier it was possible for the bullet to have been embedded deeper in defendant's foot, yet not deep enough to cause muscle or bone damage, and that defendant could then have walked normally. When a bullet is embedded underneath the skin between the skin layer and the muscle layer, it will usually come closer and closer to the skin surface over a period of time and becomes an irritation when it rises to the surface.

Renaldo Dixon, a friend of defendant's, testified that in July 1979, defendant had a mustache but no beard. In August 1980, he saw defendant walking on crutches, and defendant then had a mustache and goatee. He estimated defendant's height as 6 feet 4 inches or 6 feet 5 inches.

Jimmy Dixon—defendant's brother—testified that defendant had a goatee, mustache, and long sideburns in 1980, and he estimated his height to be 6 feet 5 inches or 6 feet 6 inches. He saw defendant on September 20, 1980, and he was limping.

OPINION

■ Defendant contends that the trial court erred in denying his motion to suppress his identification at a lineup where his attorney was not present. Although it is well established that the sixth amendment right to counsel at a lineup does not attach until the initiation of "judicial adversary proceedings" (*Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877), defendant initially argued that even if a judicial adversary proceeding had not yet been initiated at the time of his arrest, he still had a right to have counsel present at the lineup. He argues that this right accrued because counsel who had been appointed for him on another charge was present when he was arrested on the instant charge. Subsequent to the filing of defendant's brief, the Illinois Supreme Court held that a defendant was not denied the sixth amendment right to counsel, even though counsel had already been appointed for him on an unrelated charge. (*People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228, *cert. denied* (1984), 469 U.S. 935, 83 L. Ed. 2d 270, 105 S. Ct. 334.) In *Martin*, a public defender had been appointed to represent defendant on a rape charge, and while in custody therefor he was questioned by a police investigator and an assistant State's Attorney regarding an unrelated charge. The *Martin* court held that the State was not required to contact Martin's public defender or to advise defendant of a right to confer with specific counsel. In the present case, then, defendant's sixth amendment right to counsel did not accrue as a result of his previous rape charge but accrued only if "judicial adversary proceedings" had already been initiated with respect to the current charges.

Defendant now argues that the securing of an arrest warrant and the filing of a complaint constitutes the initiation of judicial adversary proceedings and refers us to several appellate court decisions in support thereof. We note, however, that in *People v. Owens* (1984), 102 Ill. 2d 88, 464 N.E.2d 261, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 297, 105 S. Ct. 362, the Illinois Supreme Court indicated that respectable authority existed that whether adversarial proceedings commence with the filing of a complaint depends on the degree of prosecutorial involvement, and the court also noted a similar case in which a court held that the filing of a complaint by a police officer in order to secure an arrest warrant, with no indication of prosecutorial involvement, does not necessarily constitute the commencement of judicial adversary proceedings as might the filing of a complaint by or at the direction of the prosecutor. As a result of the waiver situation present in *Owens*, however, the supreme court declined to resolve the issue, and since the complaint in the present case was filed by the po-

lice officer in order to secure the arrest warrant, this case fits squarely into the area which remains unresolved after *Owens*. See also *People v. Leverston* (1985), 132 Ill. App. 3d 16.

■ As in *Owens* and *Leverston*, however, the suppression of the lineup identification in this case does not turn on the point at which judicial adversary proceedings are initiated, since defendant has here also waived any sixth amendment right to counsel which he may have had. Defendant admitted at the suppression hearing that the arresting officer told him that he had a warrant for his arrest for rape. Defendant's attorney previously appointed on the unrelated charge advised him of his rights at the time of the arrest and also told him that he had the right to have an attorney present at the lineup which was to be conducted by the police later that day. Despite having been so informed, defendant admitted that he did not ask either that this or any attorney be present for the lineup. Here, defendant testified that he understood that he had a right to an attorney at the lineup, and we find that he waived this right by his failure to request the assistance of counsel. (*People v. Owens* (1984), 102 Ill. 2d 88, 464 N.E.2d 261, cert. denied (1984), 469 U.S. 963, 83 L. Ed. 2d 297, 105 S. Ct. 362.) We therefore conclude that the trial court properly denied defendant's motion to suppress the lineup identification.

Defendant next contends that he was not proved guilty beyond a reasonable doubt because the State did not adequately prove that he was the second offender. Defendant admits that the complainant had an excellent opportunity to observe her attackers at close range in a well-lit area, but he argues that the discrepancies and omissions in complainant's initial description raise a reasonable doubt as to her identification of him. It is well established, however, that the sufficiency of identification testimony is a fact question (*People v. Palmer* (1984), 125 Ill. App. 3d 703, 466 N.E.2d 640), and that a positive identification by a single witness who had an ample opportunity to observe is sufficient to support a conviction (*People v. Tate* (1981), 87 Ill. 2d 134, 429 N.E.2d 470). Defendant does not challenge the procedures followed in the identifications here as being overly suggestive; instead, he argues that as a result of the discrepancies and omissions in the initial description given by complainant, her testimony was not the clear and convincing proof needed for a rape conviction. We note that "[p]recise accuracy in a defendant's description, however, is not required when the identification is positive," and, if the complainant's story is consistent and the discrepancies do not detract from its reasonableness, her testimony can still be clear and convincing. *People v. Palmer* (1984), 125 Ill. App. 3d 703, 710, 466 N.E.2d 640, 646.

It appears to us that the complainant's testimony in this case was totally consistent, and we believe that the discrepancies and omissions advanced by defendant were not of such a nature as would detract from the reasonableness of complainant's testimony. Discrepancies or omissions of detail go to the weight of the testimony and are to be evaluated by the trier of fact. *People v. Bibbs* (1981), 101 Ill. App. 3d 892, 428 N.E.2d 965.

In her initial description, complainant estimated that defendant was approximately 6 feet or 6 feet 1 inch, 24 or 25 years of age, and weighed 160 to 170 pounds. Defendant was in fact 24 years old at the time of the offense and, at the time of trial, weighed 165 pounds, but he and members of his family and a friend testified that he was about 6 feet 5 inches. While few people are accurate judges of height, weight, and age (see *People v. Evans* (1962), 25 Ill. 2d 194, 184 N.E.2d 836, *cert. denied* (1963), 372 U.S. 922, 9 L. Ed. 2d 727, 83 S. Ct. 738; *People v. Palmer* (1984), 125 Ill. App. 3d 703, 466 N.E.2d 640), complainant's estimates here regarding age and weight were extremely accurate. This accuracy immediately following the occurrence leads us to the conclusion that the 4-inch discrepancy in her estimate of his height was not significant. We believe that the jurors who observed the defendant in court were in a far better position than this court to evaluate the weight, if any, to be given this alleged discrepancy in height. (See *People v. Palmer* (1984), 125 Ill. App. 3d 703, 466 N.E.2d 640, citing *People v. Evans* (1962), 25 Ill. 2d 194, 184 N.E.2d 835, *cert. denied* (1963), 372 U.S. 922, 9 L. Ed. 2d 727, 83 S. Ct. 738.) Defendant argues that in *People v. Wilson* (1977), 66 Ill. 2d 346, 362 N.E.2d 291, the court found that a 7-inch discrepancy in height was a significant factor in finding evidence insufficient to convict beyond a reasonable doubt. We note, however, that the *Wilson* complainant failed to identify the defendant in a lineup and actually identified another man three times. The adequacy of the witness' opportunity to make a positive identification is the most important factor in her testimony (see *People v. Nichols* (1975), 32 Ill. App. 3d 265, 336 N.E.2d 194), and because it is clear that complainant had an excellent opportunity to observe her attackers at close range in a well-lighted area, we believe that defendant's reliance on a 4-inch height discrepancy is misplaced.

Defendant also points out that complainant did not mention that he limped on the night of the rape. It appears that defendant was shot in the chest and foot approximately one month before the rape, and he testified that he walked with a limp at the time of the offense. Complainant testified that she did not see defendant walk before she

was attacked, and while she stated that after her offenders left she saw them throw her house keys across the street and "head down East End," she was not asked by the State or defense counsel whether she observed that he limped or whether she had more than a fleeting glimpse of them. Additionally, Dr. Francisco—who removed the bullet from defendant's foot—stated that the bullet may not have affected defendant's walk at the time of the rape since an imbedded bullet generally becomes an irritation after it comes closer and closer to the surface of the skin over a period of time. Given the circumstances here, the jury could properly have found either that defendant was not limping at the time of the rape or that complainant did not have the opportunity to observe such a limp. In any event, we believe such an omission—if indeed it was an omission—is quite collateral to complainant's recognition of defendant and does not support reversal of the jury's determination. See also *People v. Ervine* (1965), 64 Ill. App. 3d 82, 212 N.E.2d 346.

Defendant, pointing to complainant's failure to mention his goatee, mustache, irregular hairline, and scar on his upper lip, cites several cases that the inability of a witness to remember whether defendant had a mustache renders an identification vague and uncertain. Those cases, however, were subsequently recognized as contrary to a line of cases holding that discrepancies such as facial hair and other facial characteristics go to the weight of the testimony and are to be evaluated by the trier of fact. See *People v. Goodman* (1982), 109 Ill. App. 3d 203, 440 N.E.2d 345; *People v. Hefner* (1979), 70 Ill. App. 3d 693, 388 N.E.2d 1059.

■ The determination made by the trier of fact with respect to the weight given the identification testimony will not be upset unless it is so contrary to the evidence that it cannot be justified. (*People v. Smith* (1982), 111 Ill. App. 3d 895, 444 N.E.2d 801.) Balanced against the three positive identifications of defendant made by complainant and the relatively accurate initial description of his weight, height, and age, we cannot find that complainant's omission—at a time when she was extremely distraught—of details regarding hairline, facial hair, and a slight scar seriously damage her identification testimony, particularly where, as here, the testimony that defendant had facial hair came only from him, his mother, a friend, and a relative. (See also *People v. Ervine* (1965), 64 Ill. App. 2d 82, 212 N.E.2d 346.) We believe the identification of defendant was sufficient to support his conviction beyond a reasonable doubt.

■ Defendant also contends that he was denied a fair trial first by admission of evidence regarding the arrest of codefendant Harold

Wilson, whose case had been severed. We disagree. In *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, the United States Supreme Court reversed a conviction where, in a joint trial, evidence was admitted as to a confession implicating Bruton by a codefendant who chose not to testify. It was held that the confession was inadmissible hearsay, and that Bruton was denied his constitutional right of confrontation by reason of his codefendant's unavailability for cross-examination.[1] Defendant here argues that Detective Slattery's testimony that defendant was identified by complainant in a photographic array shortly after Wilson's arrest allowed the jury to infer that Wilson implicated defendant in the offense and that such an implication also constituted a constitutional violation.

No *Bruton* problem exists, however, where an officer does not testify to a confession or statement of a codefendant which implicates defendant in the crime but, instead, merely testifies that he arrested defendant subsequent to the arrest of a codefendant. Although the jury could infer that the codefendant may have implicated defendant, the inference does not compel reversal. (*People v. Williams* (1977), 52 Ill. App. 3d 81, 367 N.E.2d 167.) In *Williams*, the officer's testimony was limited to his physical activities and to the "bare occurrence of his conversations with [defendant]" (52 Ill. App. 3d 81, 87, 367 N.E.2d 167, 172), and it is well established that an officer's testimony concerning his investigatory procedures is necessary and properly admitted to indicate that the police did not randomly select defendant for prosecution (see *People v. Byrd* (1976), 43 Ill. App. 3d 735, 357 N.E.2d 174).

In the present case, the following testimony was elicited regarding the connection between Wilson's arrest and the identification of Dixon as his codefendant.

"Q. When you arrived was Mr. Wilson being processed by the Police Department?

[Detective Slattery]. Yes, sir.

Q. Mr. Wilson was charged that night with crimes, was he

---

[1]In a separate bench trial, Wilson was found guilty and sentenced to concurrent terms of 40 years for rape and deviate sexual assault and 20 years for armed robbery. The convictions and sentences were subsequently affirmed by this court in *People v. Wilson* (1984), 124 Ill. App. 3d 831, 464 N.E.2d 1158. Although the record does not contain any reference to the date of Wilson's trial, we note that no *Bruton* problem exists where the cases of two defendants are severed and the defendant whose statements are at issue has already been tried, convicted, and sentenced and was therefore available to the other defendant to bring into court for cross-examination at the time of his own trial. See *People v. Wright* (1974), 56 Ill. 2d 523, 309 N.E.2d 537.

not?

A. Yes.

\* \* \*

Q. Following Mr. Wilson's being charged by the Police Department did you talk to Mrs. Carter in regard to anybody else?

A. Yes, I did.

Q. Specifically, what did you do that night with Mrs. Carter?

A. I showed her an array of five photographs and she viewed the five photographs in a stack.

\* \* \*

Q. Did you do anything in particular on October 1, 1980, Detective Slattery?

A. I proceeded to 2800 South California where I appeared before Judge DiVito, and a warrant for rape was issued for the arrest of Mr. Dixon."

Thus, it does not appear from Slattery's testimony that he had any conversation with Wilson and, in any event, his testimony as set forth above certainly did not expressly or directly implicate defendant, and as the possible basis of an inference drawn by the jury, it was clearly less direct than that found acceptable by the court in *Williams*.

■ We also see no merit in the further contention of defendant that he was denied a fair trial by admission of testimony that a knife was found on Wilson at the time of his arrest. It is the rule that physical evidence may be admitted provided there is proof to connect the object found with defendant and the crime (*People v. Miller* (1968), 40 Ill. 2d 154, 238 N.E.2d 407, *cert. denied* (1968), 393 U.S. 961, 21 L. Ed. 2d 375, 89 S. Ct. 401), and while it is not necessary to show that the object admitted was actually used, it is required that it at least be suitable for the commission of the crime (*People v. Magby* (1967), 37 Ill. 2d 197, 226 N.E.2d 33). In *People v. Cartalino* (1982), 111 Ill. App. 3d 578, 444 N.E.2d 662, this court held that bullets found in the possession of defendant's accomplice were admissible because of proof connecting them with defendant and the crime. Here, complainant testified that Wilson held a knife to her throat at times during the offenses. In view thereof and because there was proof that defendant was a participant, evidence as to the knife which was suitable for the commission of the crime charged was admissible. (*People v. Cartalino* (1982), 111 Ill. App. 3d 578, 444 N.E.2d 662; *People v. McClinton* (1978), 59 Ill. App. 3d 168, 375 N.E.2d 1342.) Here, the knife was not admitted as evidence but merely referred to as a detail of codefendant's arrest, and we believe the "details of arrest" theory for admis-

sion of the testimony is particularly appropriate in such circumstances. We find no merit in defendant's argument that since the knife was found on codefendant Wilson, the knife was irrelevant in defendant's case. Such an argument ignores defendant's own participation in the armed robbery. See also *People v. Daniels* (1976), 35 Ill. App. 3d 791, 342 N.E.2d 809, where a defendant charged with armed robbery similarly argued that a gun recovered from his codefendant shortly after the robbery was inadmissible. It was held that the gun was properly admitted despite defendant's argument that it destroyed his defense of mistaken identification and prejudicially linked him to the codefendant.

■ Defendant further argues that he was prejudiced by the State's reference to Wilson and to the testimony concerning the knife in its opening statement and closing and rebuttal arguments. He refers us to *People v. Sullivan* (1978), 72 Ill. 2d 36, 377 N.E.2d 17, in which the State told the jury that two codefendants pleaded guilty, and argues that the State here improperly presented evidence of Wilson's guilt in order to obtain a conviction against defendant. Here, not only was there no plea of guilty by Wilson, but the State also did not refer to Wilson's conviction, and thus it appears clear that the State did not—even implicitly—present evidence of Wilson's guilt. Defendant objects particularly to several comments made during rebuttal closing argument, and argues that these comments had the *effect* of arguing Wilson's guilt. None of them were objected to at trial, however, and the objections are therefore waived for purposes of appeal. (*People v. Lewis* (1981), 88 Ill. 2d 129, 430 N.E.2d 1346.) Moreover, we note that the comments complained of did not even approach the type found improper in the case principally relied on by defendant (*People v. Buckner* (1984), 121 Ill. App. 3d 391, 459 N.E.2d 1102), where the prosecutor came close to drawing the specific inference that defendant was implicated by an accomplice when he asked, "Do you think that's a coincidence?" with reference to a conversation between codefendant and police officers and defendant's subsequent arrest.

In reviewing the prosecutor's comments on the other bases of error asserted by defendant, we first note that many of the statements were not objected to by defendant at trial and are therefore waived. (*People v. Lewis* (1981), 88 Ill. 2d 129, 430 N.E.2d 1346.) Since the evidence is not closely balanced in the light of the positive identifications made by complainant, the plain-error rule does not apply (*People v. Buckner* (1984), 121 Ill. App. 3d 391, 459 N.E.2d 1102), and we will discuss only those comments to which defendant objected at trial.

■ Defendant first claims that the prosecutor improperly argued on rebuttal that Wilson's 10-year friendship with defendant further proved defendant's guilt. In his own closing argument, however, we note that defense counsel indicated that complainant's family was simply "out to get someone" when they searched the bars for the two rapists, and that after complainant made a mistake in identifying defendant from the photographs placed before her, she refused to back down in her subsequent identifications. Defense counsel then indicated that, as a result, defendant was forced to face "this mysterious charge," and he goes on to state that the jury cannot find defendant guilty merely on the basis of one person's testimony because this is not Iran or Central America. We find that the prosecutor's comment was simply an attempt to counter defendant's implication that he was randomly plucked off the street and prosecuted. (See *People v. Byrd* (1976), 43 Ill. App. 3d 735, 357 N.E.2d 174.) In the light of defendant's closing argument, we believe such comment was invited, and thus not improper. See *People v. Dunning* (1980), 88 Ill. App. 3d 706, 410 N.E.2d 1052.

The prosecutor also referred to the complainant's lack of a motive to testify falsely against anyone, and indicated that she would have to be a very immoral or dishonest person to point to just anyone—either Wilson or Dixon. Defense counsel objected, and the trial court sustained the objection and limited the application of the comment to Dixon. We believe the comment itself was also invited by defense counsel's implication that defendant was arbitrarily selected for prosecution, and we also find that any prejudicial effect was eliminated when the trial court sustained the objection with respect to Harold Wilson.

■ Defendant further posits that he was denied due process and his right to confrontation when the trial court denied him an opportunity to present testimony on an experiment allegedly conducted by the jury during deliberations on the crucial issue of identification. The testimony or affidavit of a juror may be admitted to show that the jury had made a private investigation into evidentiary matters crucial to the question of defendant's identification. (*People v. Holmes* (1978), 69 Ill. 2d 507, 372 N.E.2d 656.) In *Holmes*, one of the arresting officers testified that defendant's shoe prints in the snow matched those of the assailant, and several members of the jury went to a Florsheim store to inspect various shoe heels for the purpose of ascertaining designs. Such activity constituted an independent investigation and generated improper information in the nature of evidence which clearly violated the well-established rule that the trier of fact cannot "con-

duct experiments or private investigations *which have the effect of producing evidence which was not introduced at trial.*" (Emphasis added.) (*People v. Gilbert* (1977), 68 Ill. 2d 252, 259, 369 N.E.2d 849, 852.) In *People v. Kurena* (1980), 87 Ill. App. 3d 771, 410 N.E.2d 277, the jurors constructed and experimented with a cardboard knife during their deliberations. The jurors used the cardboard knife to determine whether the victim's wounds could have resulted from a right- or left-handed stabbing, depending on the position of the parties and whether the knife could be concealed in a sleeve or seen at a distance. The court held that the experiments were performed within the bounds of the evidence produced at trial, since the actual knife was admitted into evidence and there was evidence both that defendant hid the knife in his sleeve and that the wounds could have been caused by either a right- or left-handed person. It is also well established that the use of juror affidavits or testimony cannot be used to show the motive, method, or process by which the jury reaches its verdict (*People v. Preston* (1979), 76 Ill. 2d 274, 391 N.E.2d 359), and that a jury has a right to "consider the evidence in the light of their own knowledge and observation in the affairs of life." (*People v. Rogers* (1959), 16 Ill. 2d 175, 182, 157 N.E.2d 28, 32.) Here, defendant alleges that two jurors wrote a description of one of the State's Attorneys and then compared their descriptions. We do not believe that such action had the effect of producing evidence, particularly since the "experiment" did not even refer to defendant but to one of the attorneys. It appears to us that the jury's action is thus properly characterized as part of the mental process by which the jury reached its verdict, and we find that defendant was not denied his right to confrontation where no evidence was actually produced.

■ Defendant finally contends that the trial court abused its discretion when it sentenced him to concurrent extended terms of 50 years for rape and 50 years for deviate sexual assault. We initially note—and defendant concedes—that the extended terms of 40 years for rape and deviate sexual assault which were imposed on his codefendant Harold Wilson have been affirmed by this court in *People v. Wilson* (1984), 124 Ill. App. 3d 831, 464 N.E.2d 1158. Defendant argues, however, that the 10-year disparity between his sentences and Wilson's sentences is not justified. Although the trial court's decision is normally given great weight with respect to the imposition of sentences (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882), "[a]n arbitrary and unreasonable disparity between the sentences of codefendants who are similarly situated *** cannot be defended" (*People v. Godinez* (1982), 91 Ill. 2d 47, 55, 434 N.E.2d 1121). Dispar-

ity between sentences will not be disturbed where it is warranted by differences in the codefendants' criminal records, their rehabilitative potential, or the nature and extent of their participation in the offenses. (See *People v. Godinez* (1982), 91 Ill. 2d 47, 434 N.E.2d 1121.) Here, we see no reasonable basis to distinguish between the two offenders. Additionally, we note that the record does not indicate that the trial court was aware of the sentence imposed on Wilson, as in imposing sentence on defendant, it specifically noted that—unlike Wilson—defendant did not threaten the complainant with the knife nor did he beat her. Pursuant to our authority under Supreme Court Rule 366 (87 Ill. 2d R. 366), we therefore reduce defendant's concurrent sentences for rape and deviate sexual assault to 40 years.

For the reasons stated, defendant's convictions are affirmed; but the sentences for rape and deviate sexual assault are each reduced to 40 years.

Affirmed as modified.

MEJDA, P.J., and LORENZ, J., concur.